BARRACK, RODOS & BACINE
STEPHEN R. BASSER (121590)
sbasser@barrack.com
SAMUEL M. WARD (216562)
sward@barrack.com
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

BRANSTETTER, STRANCH
& JENNINGS, PLLC
J. GERARD STRANCH, IV
gstranch@branstetterlaw.com
JAMES G. STRANCH, III
jstranch@branstetterlaw.com
227 Second Avenue N, Fourth Floor
Nashville, TN 37201-1631
Telephone: (615) 254-8801
Facsimile: (615) 250-3937

*Co-Lead Counsel for Lead Plaintiffs Oakland County Employees' Retirement System, Laborers' District Council Contractors' Pension Fund of Ohio, and Woburn Retirement System and the Proposed Class*

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re OMNIVISION TECHNOLOGIES, INC. LITIGATION | Case No.: 5:11-cv-05235-RMW |
| This Document Relates To: ALL ACTIONS | **LEAD PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date: October 26, 2012<br>Time: 9 a.m.<br>Dept. Courtroom 6, 4th Floor<br><br>Before: Honorable Ronald M. Whyte |

**Table of Contents**

I. INTRODUCTION .......... 1
II. STATEMENT OF ISSUES .......... 3
III. SUMMARY OF ALLEGATIONS .......... 3
A. OmniVision's Business and the Apple iPhone .......... 3
B. Apple iPhone Design to Market Launch Cycle .......... 4
C. Apple Selects Sony for the 2011 iPhone .......... 4
D. OVTI Deceives Investors and Market Analysts .......... 5
IV. ARGUMENT .......... 10
A. Legal Standards on a Motion to Dismiss .......... 10
B. The Complaint Sufficiently Pleads Falsity .......... 11
1. Defendants' Statements and Omissions Created a Different Impression in the Market Re: OVTI's 2011 iPhone Positioning and Success than What was Actually True .......... 12
2. Defendants' Statements Are Not Protected By The Safe Harbor .......... 18
3. Lead Plaintiffs Plead Sufficient Detail to Attribute Statements Made Through Analysts to Defendants .......... 20
C. Confidential Witness Allegations are Sufficiently Pleaded .......... 22
D. Factual Allegations Demonstrate a Strong Inference of *Scienter* .......... 24
1. OVTI's Apple iPhone Business Was a Core Operation with Embedded Design to Launch Milestones Providing a Strong Inference of *Scienter* .......... 25
2. Insider Trading Demonstrates a Strong Inference of *Scienter* .......... 29
V. CONCLUSION .......... 32

# Table of Authorities

## Cases


*Allison v. Brooktree Corp.*,
999 F. Supp. 1342 (S.D. Cal. 1998) .... 17, 24

*Applestein v. Medivation, Inc.*,
2011 U.S. Dist. LEXIS 92230 (N.D. Cal. Aug. 18, 2011) .... 31

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal 2009) .... 17, 31

*Batwin v. Occam Networks, Inc.*,
2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) .... 23, 30

*Beloit Corp. v. Emett & Chandler Cos., Inc.*,
1991 WL 153459 (9th Cir. Aug. 14, 1991) .... 16

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .... passim

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) .... 23

*City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) .... 21

*Commc'ns Workers of Am. Plan for Emples. Pensions and Death Benefits v. CSK Auto Corp.*,
525 F. Supp. 2d 1116 (D. Ariz. 2007) .... 25

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) .... 21, 22

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) .... 11

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) .... 25

*Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*,
2011 U.S. Dist LEXIS 35661 (M.D. Tenn. Mar. 31, 2011) .... 16

*Hayley v. Parker*,
2002 U.S. Dist. LEXIS 4849 (C.D. Cal. Mar. 18, 2002) .... 22

*Hungarter v. Provident Life & Accident Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .... 29

*In re Apollo Group, Inc. Sec. Litig.*,
395 F. Supp. 2d 906 (D. Ariz. 2005) .... 12

*In re Apple Computer, Inc.*,
243 F. Supp. 2d 1012 (N.D. Cal. 2002) ........ 21

*In re ATI Techs., Inc. Sec. Litig.*,
216 F. Supp. 2d 418 (E.D. Pa. 2002) ........ 16

*In re Cadence Design Sys., Inc. Sec. Litig.*,
692 F. Supp. 2d 1181 (N.D. Cal. 2010) ........ 23, 29

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........ 31

*In re CV Therapeutics, Inc. Sec. Litig.*,
2004 U.S. Dist. LEXIS 17419 (N.D. Cal. Aug. 5. 2004) ........ 21, 22

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ........ 23

*In re Gilead Scis. Sec. Litig.*,
2009 U.S. Dist. LEXIS 46751 (N. D. Cal. June 3, 2009) ........ 23, 24

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ........ 20

*In re Impac Mortg. Holdings, Inc.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ........ 17

*In re LeapFrog Enters, Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) ........ 20

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........ 23

*In re Merck & Co., Inc. Sec. Deriv. & "ERISA" Litig.*,
2011 U.S. Dist. LEXIS 87578 (D.N.J. Aug. 8, 2011) ........ 21

*In re OmniVision Techs., Inc.*,
2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005) ........ 30, 31

*In re Secure Computing Corp. Sec. Litig.*,
120 F. Supp. 2d 810 (N.D. Cal. 2000) ........ 19

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ........ 21, 23

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
2007 U.S. Dist. LEXIS 21953 (N.D. Cal. Mar. 9, 2007) ........ 29

*In re STEC Inc. Sec. Litig.*,
2011 U.S. Dist. LEXIS (C.D. Cal. June 17, 2011) ........ 11, 15

*In re SunPower Sec. Litig.*,
2011 WL 7404238 (N.D. Cal. Dec. 19, 2011) ........ 19

*In re Synchronoss Sec. Litig.*,
705 F. Supp. 2d 367 (D.N.J. 2010) .......... 17, 18

*In re Textainer P'ship Sec. Litig.*,
2007 U.S. Dist. LEXIS 5283 (N.D. Cal. Jan. 10, 2007) .......... 29

*In re Tut Sys. Sec. Litig.*,
2002 U.S. Dist. LEXIS 27092 (N.D. Cal. Aug. 15, 2002) .......... 22

*In re VeriFone Sec. Litig.*,
11 F.3d 865 (9th Cir. 1993) .......... 13

*In re Versant*,
2001 U.S. Dist. LEXIS 25009 (N.D. Cal. Dec. 4, 2001) .......... 22

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) .......... 12

*Janus Capital Group Inc., v. First Deriv. Traders*,
131 S. Ct. 2296 (2011) .......... 21

*Jensen v. Kimble*,
1 F.3d 1073 (10th Cir. 1993) .......... 15

*Karacand v. Edwards*,
53 F. Supp. 2d 1236 (D. Utah 1999) .......... 12

*Livid Holdings Ltd.* v. *Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) .......... 20

*Mallen v. Alphatec Holdings, Inc.*,
2012 U.S. Dist. LEXIS 39416 (S.D. Cal. Mar. 22, 2012) .......... 20

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
927 F. Supp. 1297 (C.D. Cal. 1996) .......... 30

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011) .......... 12, 25

*McCarthy v. C-COR Elecs. Inc.*,
909 F. Supp. 970 (E.D. Pa. 1995) .......... 30

*McCormick v. Fund Am. Cos.*,
26 F.3d 869 (9th Cir. 1994) .......... 15

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) .......... 11, 15

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .......... 12, 31

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) .......... 11, 21, 22

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ........ 30

*Reese v. BP Exploration (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) ........ 11, 15, 16

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ........ 24, 30

*Rosenbaum Capital, LLC v. McNulty*,
549 F. Supp. 2d 1185 (N.D. Cal. 2008) ........ 21

*Scritchfield v. Paolo*,
274 F. Supp. 2d 163 (D. R.I. 2003) ........ 15

*South Ferry LP, # 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ........ 25

*South Ferry, LP #2 v. Killinger*,
399 F. Supp. 2d 1121 (W.D. Wash. 2005) ........ 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........ 2, 11, 25

*United States v. Hernandez-Escarsega*,
886 F.2d 1560 (9th Cir. 1989) ........ 23

*Zucco Partners, LLC v. Digimore Corp.*,
552 F.3d 981 (9th Cir. 2009) ........ 11, 23

**Statutes, Rules and Regulations**

17 C.F.R. §240.10b-5(b) ........ 12

15 U.S.C. § 78u-5(c)(I) ........ 20

## I. INTRODUCTION

Lead Plaintiffs Oakland County Employees' Retirement System, Laborers' District Council Contractors' Pension Fund of Ohio, and Woburn Retirement System ("Lead Plaintiffs") have filed a detailed Consolidated Class Action Complaint ("Complaint") seeking to recoup significant investor losses arising from Defendants' violations of the federal securities laws.[1] The Complaint satisfies the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *Tellabs* and Ninth Circuit authority. Lead Plaintiffs plead Defendants' many false statements and omissions – including "who, what, when, where and why" – deceptively creating an impression in the market that OmniVision ("OVTI"), as it had been before, was in position as Apple's exclusive or dominant supplier of complementary metal-oxide semi-conductor ("CMOS") image sensors for its 2011 iPhone 4S product launch when, in truth, OmniVision was dislodged by a competitor from that coveted position before the inception of the Class Period (August 27, 2010 through November 6, 2011).

Defendants' misrepresentations and omissions regarding OVTI's then-present business picture respecting its vital supply position with its iconic customer — Apple — fooled investors, including professional market analysts who followed the company, giving them an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

After the full picture of the truth — that OVTI had lost its exclusive or dominant CMOS sensor supply position to Sony, and was never able to produce compatible CMOS sensors with sufficient yields for the 2011 iPhone 4S — was finally disclosed, deceived market analysts admonished Defendants for their "evasion" and "credibility problems" - a "major issue." Such admonishments by those typically relying on their relationships with corporate management are a powerful indicator of how deeply Defendants had misled the investment community.

---

[1] OmniVision Technologies, Inc., Shaw Hong ("Hong"), Anson Chan ("Chan"), and Aurelio "Ray" Cisneros ("Cisneros") are referred to herein as "Defendants" and defendants Hong, Chan and Cisneros are referred to herein as "Individual Defendants."

The "core operations inference" of *scienter* adopted by the Ninth Circuit readily applies here. Under these peculiar circumstances, as in *Berson*, it would be "absurd to suggest" that Defendants — OVTI's top management — who admit that OVTI's "smartphone" business is its "number one priority" — did not know that the company was no longer positioned as Apple's exclusive or dominant CMOS sensor supplier for the 2011 iPhone. 527 F.3d at 988-89. This is buttressed by the fact that the 2011 Apple iPhone design-to-launch cycle was prolonged — necessarily so. Embedded within that process were important periodic milestones, many occurring before the Class Period. Indeed, Sony gained the 2011 iPhone CMOS sensor slot, dislodging OVTI from its once exclusive perch in early 2010. And OVTI's effort to play a back-up role to Sony, hoping to perhaps one day regain its coveted position with a new 8 megapixel ("MPx") CMOS sensor — the OV 8830 —never really got off the ground. Apple rejected OVTI's new CMOS sensor prototype even as late as June 2011. And, as it belatedly admitted, OVTI never achieved sufficient production yields of the OV 8830, even as numerous performance milestones passed by. Given the passage of these important milestones, it is absurd to suggest that Defendants did not know of OVTI's major loss of position.

*Scienter* is further buttressed by Defendants' stock sales, dramatically out of line with prior trading history and suspiciously timed between May 31 to July 5, 2011, after numerous, critical milestones respecting the 2011 iPhone contract previously awarded to Sony had passed; in close proximity to Apple's initial iPhone 4S launch date of June/Summer 2011; shortly before rumors started to percolate in and around July 5, 2011 that were immediately and successfully squelched by Defendants on July 6, 2011, that Sony had captured Apple's business; and less than two months before OVTI's initial partial corrective disclosure of August 25, 2011.

Viewed "holistically," the factual allegations of the Complaint, together with all reasonable inferences therefrom, demonstrate a "strong inference of '*scienter*' at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## II. STATEMENT OF ISSUES

1. Do Lead Plaintiffs adequately plead that Defendants knowingly misled investors via actionable false statements and/or omissions regarding OmniVision's true positioning as the exclusive or dominant supplier of CMOS sensors for the 2011 iPhone?

## III. SUMMARY OF ALLEGATIONS

### A. OmniVision's Business and the Apple iPhone

OVTI is a designer, manufacturer and supplier of CMOS sensors used in digital cameras and mobile phones to convert optical images into electronic signals. ¶ 46.[2] OVTI's smartphone business was at all times material – its "number one priority." ¶ 190, 196. OVTI's most high-profile CMOS sensor supply contract, upon which the investment community was intensely focused, was with its "premium," "Tier-1" customer, Apple, Inc., ("Apple"). ¶ 47. Apple was the smartphone market leader and a major, continuing focus of OVTI, which held weekly meetings discussing its business with its iconic customer. ¶ 62. OVTI worked "hand in hand" with its "customers at every stage" of its product cycle, and the Individual Defendants — CEO Hong, in particular, who exhibited a controlling management style — were "hands on," detail oriented managers, deeply engaged in the company's daily operations. ¶¶ 191, 196.

OVTI was the ***exclusive*** supplier of CMOS sensors for Apple's iPhone 3GS, introduced on June 9, 2009, and iPhone 4, introduced on June 20, 2010. ¶ 53.[3] The investment community understood this, based on buzz phrases and statements by OVTI management that navigated around Apple's confidentiality requirements. ¶¶ 47, 53-56. Apple's iPhone was a great success, and its introduction of the next generation, 2011 iPhone — initially set for launch in June 2011 — was highly anticipated by the market. OVTI had conditioned the market to believe that its exclusive contract with Apple was secure thanks to OVTI's BSI technology – giving it a

---

[2] Unless otherwise indicated, paragraph references ("¶ __") are to the complaint.

[3] In 2008, OVTI introduced a new approach to CMOS sensor technology with its "backside illumination" ("BSI") architecture. ¶ 48. OVTI's second generation backside illumination architecture — BSI-2 — was introduced in February 2010. *Id*.

competitive edge that was a "differentiator". ¶¶ 82, 126. OVTI's iPhone supply contract with Apple was critical to its success.

**B. Apple iPhone Design to Market Launch Cycle**

The design to launch cycle for Apple's 2011 iPhone, anticipated for launch in June 2011, necessitated extensive lead times. ¶¶ 209, 213-22, 224. According to a reliable supply chain expert, Apple's procurement process for the newly designed iPhone 4S began in early 2010, well before the Class Period. ¶ 213. Next, Apple finalized its initial product launch forecast and definition of required quantities from component suppliers in the May/June 2010 time frame, followed by Apple's issuance of a purchase order contract to its selected suppliers in the June/July 2010 timeframe. ¶¶ 219-20. By this time, OVTI would have known that it did ***not*** maintain its exclusive or dominant role as the supplier of CMOS sensors for Apple's next generation iPhone. ¶¶ 220-21.

**C. Apple Selects Sony for the 2011 iPhone**

By April 13, 2010, well before the Class Period, Sony had already dislodged OVTI from its perch as Apple's exclusive or even dominant CMOS sensor supplier. ¶ 59.[4] OVTI managers met late in May, 2010 and discussed the fact that Sony had the ability to deliver on Apple's requirements. ¶¶ 57-59, 61-62. By the advent of and throughout the Class Period, OVTI was not the exclusive or dominant CMOS supplier for the 2011 iPhone. As late as June 2011, after numerous milestones had passed, OVTI's own next generation BSI-2 8 MPx technology — the OV 8830 — was still not acceptable to Apple. ¶¶ 125, 128. OVTI never achieved sufficient yield levels of its 8MPx sensors using its next generation BSI-2 architecture, as it belatedly acknowledged. ¶¶ 165, 173. And the OV 8830 would ultimately be abandoned shortly after the end of the Class Period. ¶ 97. This loss, even before the Class Period began, of OVTI's exclusive or dominant component supply position respecting the Apple iPhone spelled disaster

[4] Sony targeted Apple's high-profile smartphone product segment. It succeeded in capturing the coveted supply position after a Senior Vice President ("SVP") from Japan, (along with the SVP's entire family), was sent to live in Cupertino, California, and lead a unit of Sony engineers dedicated to deliver the CMOS sensor component business for the new Apple iPhone — failing which that SVP and Sony team would have been terminated. ¶ 57.

for the company. ¶ 126. Meanwhile, Sony was living up to its selection by Apple and purchased a new plant in Taiwan from Toshiba in December, 2010 to mass produce CMOS sensors. ¶ 90.

### D. OVTI Deceives Investors and Market Analysts

When speaking publicly about OVTI's competitive landscape, positioning and success with Tier 1 customers, design wins, smartphone market share, and ability to execute, Defendants continued to paint a positive picture, without disclosing this devastating adverse change and loss respecting its smartphone business – its "number one priority" – with its key and most important customer. Defendants deceived investors and analysts with rosy portrayals of market share gains, design wins with Tier-1 customers, strong positioning, and a leading BSI-2 technology providing it with a competitive edge — a "differentiator" — and such a wide competitive gap that its competitors were still playing catch up. Defendants' statements and omissions led the market to believe that OVTI remained the exclusive, or dominant, supplier of CMOS sensors for Apple's next generation iPhone.

Defendants painted a rosy image of OVTI's success with Apple respecting its 2011 iPhone via through a series of quarterly conference calls (¶¶ 75-76, 85-87, 98, 112-15, 137-39), misleading market professionals to believe OVTI was well positioned and succeeding in maintaining its exclusive perch respecting the Apple 2011 iPhone (¶¶ 77, 84, 88, 92, 96, 99, 100, 118, 135, 143-44, 151, 155), and one-on-one meetings or calls with analysts it used as conduits, behind whom Defendants could be sheltered from any claim by Apple that OVTI violated its confidentiality agreement. ¶¶ 79-80, 93, 103, 127-29, 147, 149.[5] Defendants never once portrayed an accurate image of the truth.

---

[5] Apple contractually prohibited suppliers, such as OVTI, from revealing that Apple was their customer. ¶ 51. This created a "catch-22" problem should OVTI — a publicly traded company — elect to speak to the market about, *inter alia* such topics as customers, competitive lead, design wins, market share and demand for its products, given the required need for speaking the truth and transparency mandated by the federal securities laws. ¶ 53. Rather than stay quiet about such issues, Defendants elected to speak. As they had done before the advent of the Class Period (*see* ¶¶ 51, 53-56, 65-68), and mindful of Apple's admonition respecting confidentiality, when addressing the investment community in a public forum, the Individual Defendants spoke in buzz phrases creating and fostering the impression in the market that OVTI

OVTI's exclusive CMOS sensor supplier status with Apple, fueled by its professed technological lead — a competitive "differentiator" — was so commonly known before the Class Period that OVTI management's public statements, laced with express confirmations and bolstered by one-on-one discussions with analysts, continued to foster and did not correct the market's perception and belief throughout the Class Period. ¶ 52.

On August 27, 2010 — the beginning of the Class Period — as they had before, Defendants utilized buzz phrases in their quarterly investor conference call to induce the market to believe that OVTI remained Apple's exclusive, dominant iPhone CMOS sensor supplier. Defendants represented that OVTI was "uniquely positioned" and "comfortable with our assessment that no other competitor is likely to approach our current level of BSI production capabilities within the short-term", "BSI products" were "proven" to be a "key differentiator" that "will continue to be a decisive factor in securing further design wins"; that OVTI's BSI position "backing in the high value products, high value customers, represents a significant market share gain…" and that OVTI was in a "very advantageous…very strong market position with our technology and products." ¶¶ 75-76. In a "Management Access Call" with analysts on September 16, 2010, defendant CFO Chan led analysts to believe, and have increased confidence that, because of the "year long design cycle for smartphones, lack of 8MP BSI competition and OVTI's proven track record… OVTI likely maintains its ***sole source position in the next gen iPhone***." ¶ 79. CFO Chan met with JP Morgan analysts at OVTI's headquarters on September 28, 2010, who reported, based on that meeting, that OVTI was continuing to see "market share gains," citing Samsung (which did not yet have BSI technology) as the "main competitor," not Sony (which had BSI technology) and that OVTI's "competitive landscape remains benign." ¶ 80.

On November 30, 2010, CEO Hong proclaimed that OVTI was "more than a generation ahead of most competitors," with a "***strong position***" in the "smartphone segment," adding "we

---

was and remained the CMOS sensor provider for its highly valued, iconic "premium Tier-1," "brand name" customer's next generation iPhone.

are poised to deliver next generation products based on this technology and we are actively engaged in early products with ***key customers***" – a clear reference to key customer Apple. ¶¶ 16, 85. Not leaving any doubt, defendant VP Cisneros added "we're extremely happy how OmniBSI has been adopted… ***by all Tier 1 customers in all segments***," that "***positions OmniVision very, very strongly and very, very favorably***… into spaces we play in." ¶ 86. VP Cisneros supplemented that statement with an obvious reference to OVTI's inclusion in Apple's 2011 iPhone, "we are extremely, extremely pleased with the engineering progress… extremely pleased with the product developments… directly taking place today… very, very pleased with our engagements with Tier 1 leading customers to adopt Omni BSI-2." *Id.*[6]

On January 10, 2011, OVTI "management" met with analysts, squelching any concerns about competition from Sony. Based on that meeting with "Omnivision's management," analysts reported that "the ***vast majority of design decisions for calendar year 2011 smartphone models have been made,"*** adding ***"the biggest challenge this year will be smoothly executing the manufacturing transition to BSI-2 architecture rather than maintaining share***" — an unqualified assurance and confirmation that OVTI remained Apple's exclusive CMOS sensor supplier for the 2011 Apple iPhone. ¶ 93.

On February 15, 2011, OVTI announced the introduction of its new 8 MPx BSI-2 CMOS sensor — the OV 8830 — representing it was "highly suitable for feature rich smartphones" (itself a coded reference to the 2011 Apple iPhone), with mass production expected to ramp in "the second half of 2011" – a time frame consistent with the 2011 Apple iPhone retail launch cycle initially slated to commence in June 2011 (or Summer 2011). ¶ 95. But the OV 8830 was not an example of OVTI's dominant technological lead as the announcement led the market to believe. Instead, it reflected OVTI's undisclosed desperation,

[6] CEO Hong referenced OVTI's "leading edge technology" giving it a "very advantageous position to win high profile designs" that defendant VP Cisneros said was bringing "in the right customers…." ¶ 87.

as important milestones with respect to the Apple 2011 iPhone had passed OVTI by and Sony dislodged OVTI from its coveted position of exclusivity and dominance. ¶ 97.

On February 24, 2011, VP Cisneros reassured investors that OVTI was not vulnerable to competition stating "we feel very, very comfortable in the market place ***in whatever competitive landscape we come across***." ¶ 98. CEO Hong assured investors that the mass production of the OV 8830 remained "***on schedule***," while Cisneros clarified it was targeted for mass production for "key" markets in the "late summer season," adding – "***key customers*** are working with us for their critical ramp-up plans…. we are planning for significant production volumes….we are in a very ***strong position*** to continue growing our business" – representations that meant OVTI had maintained its exclusive and lucrative iPhone business with respect to the 2011 iPhone. *Id*.[7]

On May 26, 2011, OVTI assured investors of its "ability to deliver high-performance image sensors for Tier-One Customers." ¶¶ 111-12. CEO Hong highlighted OVTI's position with "the right customers" and OVTI's "proprietary technology that limits access to new competitors." ¶¶ 111-12, 114. VP Cisneros assured that OVTI's ***new 8 MPx sensor*** "is being ***driven by demand from key customers, primarily in the smartphone market at the onset of the product launch***" (¶ 113), and that the OV 8830 was "targeted to ***premier brand name smartphone OEMs***," expressing confidence in OVTI's ability to "***continue gaining market share***." ¶ 115. These representations and assurances further convinced analysts that OVTI was "not…losing market share in the Tier 1 handset market," that it "remains well positioned to sell products into Apple's supply chain" and that "OmniVision's…leading market share position at Apple…particularly the next gen iPhone, remains unchanged." ¶¶ 111-15, 118. But thereafter, in early June 2011, Apple returned a CMOS 8 MPx sensor prototype that OVTI was trying to get Apple to include in the 2011 iPhone, because it was incompatible and would not work with the new 2011 iPhone, causing great concern in the company. ¶ 125. Meanwhile, the Individual

---

[7] On February 25, 2011, OVTI's share price climbed to $31.43 per share from $23.85 on February 24, 2011, – a 31% increase in one day – on volume of 15,457,000 shares, signaling the fact that the market had been greatly deceived by Defendants' representations and material omissions. ¶ 102.

Defendants were engaging in highly suspicious, unprecedented insider selling commencing from May 31, 2011 through July 5, 2011. ¶¶ 181-87.

When "rumors" began to circulate on or about July 5, 2011 that Apple may be "dual sourcing" the 2011 iPhone CMOS sensor to Sony, causing some retreat in OVTI's stock price, Defendants immediately squelched them, concealing the fact that critical milestones had passed without OVTI securing its most prized position with its key customer's highly publicized 2011 iPhone offering. ¶¶ 127-29. On the morning of July 6, 2011, JP Morgan analysts, reported "based on the conversation with the CFO" that OVTI was "ramping production of 8 MPx sensors on BSI-2 for…Apple," with "manageable" yields, and that OVTI remained "on track." ¶ 127.[8]

Defendants' deception of the market continued, when lowering OVTI revenue forecasts on August 25, 2011, simply citing "an unanticipated extension in the development of the product cycle" of the 8 MPx product line arising from a "minor" technical issue. ¶¶ 137-41. This partial disclosure, which itself was deceptive, caused a significant decline in OVTI's stock price from $24.82 per share at market close on August 25, 2011 to $17.27 per share at the close of trading on August 26, 2011, on huge trading volume of 26.3 million shares. ¶ 145. This was not a full, truthful corrective disclosure. ¶¶ 142(a)-(g). It did not disclose OVTI's true position vis-à-vis the 2011 iPhone. Indeed, on September 1, 2011, CFO Chan met with and "convinced" a JP Morgan analyst that the "weaker guidance did not originate in a head-to-head competitive loss at a Tier 1 OEM." ¶ 147. After a "Management Access Call" of September 19, 2011, with CFO Chan, Wedbush analysts reported that, in terms of market share, "***management believes its OEM relationships remain unchanged***." ¶ 149.[9] Defendants' refusal to make full disclosure

---

[8] Other analysts who conferred with OVTI via defendant CFO Chan, were led to believe and reported that rumors of OVTI having yield problems and missing commercial production deadlines for the iPhone were untrue, noting that "***management reiterated*** that they still expect a significant ramp in BSI-2 shipments in the second half of CY11." ¶ 128. And on July 8, 2011, a report entitled "OmniVision is not losing any Apple business, says Detwiler Fenton" stated: "Detweiler has learned from sources within OmniVision (OVTI) that it has ***not lost any Apple business and is the lead supplier*** of CMOS image sensors for the company." ¶ 129.

[9] Reflecting Defendants' continuing deception and impact on market perception on September 30, 2011, analysts at Wedge Partners said "we believe Omnivision will remain in the

and conceal the truth continued even after *Chipworks* conducted a tear-down of the 2011 iPhone 4S in October 14, 2011, revealing a CMOS sensor manufactured by Sony. ¶¶ 157-58. According to *Bloomberg.com*, "a spokesman for Omnivision didn't return phone calls seeking comment." ¶ 159. Finally, on November 7, 2011, OVTI provided further disappointing revenue guidance. Its OV 8830 CMOS sensor — ostensibly intended for the 2011 iPhone — had failed as the product "does not seem ready for mass shipment yet," leading analysts to conclude that "the bulk of the reduced guidance… is from losing 8 megapixel sockets in the iPhone 4S to Sony." ¶¶ 163-65.[10] Frustrated analysts cited OmniVision's ***lack of "credibility," "shady executive transparency about their faltering relationship with Apple***," and continuing OVTI "***management evasion,***" while trying to get straight answers to straight questions. ¶¶ 165-74. On November 8, 2011 Oppenheimer analysts observed that "the generation corresponding to ***backside illumination, second iteration is probably lost to competitors*.**" Oppenheimer analysts pointedly noted OVTI's "***less than clear, direct replies***," while admonishing that in the "semi-conductor image sensor space…increased ***transparency is a must***." ¶ 175.

By January 31, 2012, OVTI had suffered substantial further revenue declines and its GAAP net income fell to $0.00 per diluted share. ¶ 180. And in January, 2012, it was revealed that the OV 8830 was a bust, replaced by yet another OVTI 8MPx sensor with new technology. ¶ 97.

## IV. ARGUMENT

### A. Legal Standards on a Motion to Dismiss

In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff. *Tellabs,* 551 U.S. at 322-23. All

---

new iPhone as the primary supplier," and "do not believe yield issues of the new BSI-2 sensor is impacting the Apple relationship." ¶ 151.

[10] The revelation of the whole truth caused OVTI stock to plummet further to $14.26 per share on November 8, 2011, on significant trading volume. ¶ 169.

inferences must be taken into account that one could draw from the facts alleged in the complaint. *See, id.* at 323-24. "The PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004). When viewed holistically, as *Tellabs* requires, Lead Plaintiffs have certainly pleaded a meritorious case.

**B. The Complaint Sufficiently Pleads Falsity**

"A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (quotations omitted). Whether a public statement is misleading is a mixed question generally to be decided by the trier of fact. *See, In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx), 2011 U.S. Dist. LEXIS 75093 at *25 (C.D. Cal. June 17, 2011) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). Even statements that are literally true may nonetheless be misleading, due to their context and manner of presentation. *See, Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

"[T]o properly allege falsity, a securities fraud complaint must … 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief…state with particularity all facts upon which that belief is formed.'" *Zucco Partners, LLC v. Digimore Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009) (citation omitted) (second alteration in original). Lead Plaintiffs meet this requirement, pleading the who, what, when, where and why regarding falsity and detailing Defendants' numerous statements and omissions that gave investors the comforting, albeit false, impression OVTI was well positioned as the exclusive or dominant CMOS sensor contract for the 2011 iPhone 4S, even though, in truth, it had already been awarded to Sony, displacing OVTI.

### 1. Defendants' Statements and Omissions Created a Different Impression in the Market Re: OVTI's 2011 iPhone Positioning and Success than What was Actually True

Electing to speak on topics such as design wins, engineering and supply of OVTI's CMOS sensors, its positioning with "premium Tier One" customers —understood to mean Apple — its competitive advantage owing to its BSI technology — a "differentiator" — its progress gaining smartphone market share, execution of 8 MPx BSI-2 sensor yields and the timing of ramping of mass production, Defendants were under "a duty to speak fully and truthfully." *In re Apollo Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005). Hence, when they spoke on such topics, Defendants were required to disclose the loss of OVTI's position as the sole, or even lead supplier of CMOS sensors for its key, Tier One customer's 2011 smartphone upon which the market was so highly focused. Here, a significant portion of the fraud alleged is based on Defendants' concealment of the adverse truth each time they spoke — ***omissions*** — not merely Defendants' affirmative misleading statements. Under §10(b), it is "unlawful to, among other things, '…omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) (*quoting* 17 C.F.R. §240.10b-5(b)). *See also, No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 932-33 (9th Cir. 2003) (failure to disclose known problems rendered optimistic statements actionable).[11]

In 2009 and 2010, prior to the Class Period, and while restrained by Apple's confidentiality requirements, Defendants, aided by buzz phrases understood to refer to Apple's iPhone products, created the then-accurate impression that OVTI was the exclusive CMOS

---

[11] Defendants cite several distinguishable cases in arguing that they are not responsible for their omissions. (Defendants' Motion to Dismiss Consolidated Class Action Complaint ("MTD") at 14-15). As for *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420 (9th Cir. 1994), plaintiffs did not allege (as Lead Plaintiffs do here) that the defendants already knew their product would not continue to sell well when they made statements concerning sales. In *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1250 (D. Utah 1999), defendants had no duty to make disclosures about the fourth quarter because defendants made no specific projections or forecasts regarding fourth quarter results. In *In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993), plaintiffs never alleged, as they do here, that defendants withheld information and "existing facts" known to them when they spoke to the market.

sensor supplier for the iPhone 3G and iPhone 4 launched in June 2009 and June 2010 respectively. ¶ 53. Defendants saturated the market with pronouncements concerning OVTI's smartphone "industry's highest quality 8-megapixel camera solution," using BSI technology (February 16, 2009), securing "strong" "design win activity for 5 MPx and 8 MPx products" with a "significant number of ***Tier 1 customers***" — an understood reference to Apple. *Id.* OVTI reported that it was consistently "winning new designs…in particular ***smartphone*** designs," with ***OmniVision technology*** being viewed as "***a differentiator*** for" customer product "designs" (February 26, 2009 conference call). *Id.* Defendants proclaimed OVTI's "***robust*** and ***expanding business,***" "***multi-meaningful design wins***" with OVTI "***well positioned in the smartphone market***" ***continuing to "take share from our competition***," "***uniquely positioned***" and its results a **"*testament to the competitive differentiation,*"** "***winning the smart phone market***" at **"*high resolutions*"** with "***brand name Tier 1 customers*** (August 27, 2009 conference call). *Id.* Defendants represented that OVTI was "***gaining share with multiple Tier 1 wins***" (September 24, 2009 shareholders meeting); and "***well positioned***," with "***strong growth in the smart phone category***," securing ***high profile customer smartphone devices***" "winning ***key customers***," and "***ideally positioned*** for the major transition to high definition sensors" (November 30, 2009 conference call). *Id.* Investors were informed that OVTI's **BSI-2** was "at the forefront of the development of this technology, ***well ahead of our competition***." (February 25, 2010 conference call), and continuing "to ***deliver highly differentiated solutions that meet and exceed the needs of our strategic customers and partners, who are industry leaders***," (conference call on February 25, 2010) — yet another reference understood to mean Apple. *See*, ¶¶ 53-55, 65-68.

The investment community correctly understood from Defendants' buzz word communications that OVTI had been the exclusive supplier of camera sensors for the iPhone 3GS and the iPhone 4. ¶ 47; *see, e.g.*, ¶ 53 (JP Morgan, 10/30/09: speaking of OVTI's "notable design wins, including the Apple iPhone 3GS"), ¶ 54 (Oppenheimer, 03/26/10: stating that OVTI gained significant share at "leading smart phone accounts, including Apple" during

2009). ¶ 54. On April 6, 2010 a JPMorgan analyst reported that "the CFO remains constructive regarding the firm's prospects in the second half of CY10, citing design wins that were awarded to OVTI in late CY09. We believe the firm is well positioned for the next generation Apple iPhone…" ¶ 55.

During the Class Period, Defendants again successfully navigated around the Apple's confidentiality limitations, using a similar recipe of buzz phrases, laced with direct one-on-one discussions with professional market analysts that deceptively created the impression in the market that OVTI was positioned as the exclusive and dominant CMOS sensor supplier for the 2011 iPhone 4S. The ingredients for Defendants' recipe for market deception included, for example, reference to OVTI's technological lead and superiority — a key "differentiator" (¶ 14) — the complexity of mass CMOS sensor production which made it difficult for competitors to catch OVTI, and gaining market share with respect to the smartphone segment. ¶ 16.

Defendants anchored such comforting assurances to Apple's 2011 iPhone, with references to OVTI's "strong position" in the "smartphone segment," being "actively engaged in early products with key customers," "very pleased" as "BSI has been adopted … by all Tier 1 customers in all segments" and continuous reference to "premium" "Tier 1" or "brand name" customers, Apple being OVTI's most important of course. ¶¶ 112, 115. These comforting representations were further linked to the Apple 2011 iPhone by statements referencing the "mass production" ramping of 8 MPx CMOS sensors that overlapped with its then-planned market launch cycle. ¶ 79. The positive — albeit false and deceptive — impression created in the market as a product of Defendants' general public press releases and quarterly conference call statements is illustrated by the follow-on reports of market analysts. *See, e.g.* ¶¶ 77, 79-80, 84, 88, 92, 93, 103. Defendants buttressed their impression through one-on-one calls regarding the 2011 iPhone with certain analysts (¶¶ 79-80, 93, 103, 127-29, 147, 149) — and most especially for example, on July 6, 2011 when CFO Chan squelched rumors that OVTI had missed milestones and lost its supplier slot to Sony for the 2011 iPhone — which information analysts then conveyed to the investment community. ¶¶ 127-129.

Defendants claim that they cannot be held liable for their deceptive statements and omissions because they avoided making explicit references to Apple and the iPhone 4S. *See* MTD at 13, 15. Their position fails to consider in context, and as a whole, Defendants' many statements, directly or through analysts, and ignores applicable law requiring a much more fact-intensive approach to the issue of falsity. *See, e.g.*, *Miller*, 519 F.3d at 886; *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D. R.I. 2003) ("statements are properly interpreted only by reference to the relevant circumstances that underlie their meaning"). Notably, analysts' interpretation of a statement can also reveal its tendency to mislead. *See, STEC*, 2011 U.S. Dist. LEXIS 75093 at *24 ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed."). When read in context — and mindful of their use of substantially similar buzz phrases and verbiage that previously gave the market the correct impression that OVTI was Apple's exclusive CMOS sensor supplier with regard to its 2009 and 2010 iPhone product launches (¶¶ 4-8, 53-56) — Defendants' statements were reasonably interpreted to refer to the 2011 iPhone,[12] and left "the impression of a state of affairs" — *i.e.*, OVTI's favorable positioning re: the 2011 iPhone — "that differs in a material way from the one that actually exists." *Reese*, 643 F.3d at 691 (citations omitted). Moreover, there were obvious references made by OVTI to its positioning with respect to Apple's 2011 iPhone, as illustrated, for example, by CFO Chan's one-on-one discussions with JP Morgan and Craig-Hallum on July 6, 2011, squelching rumors and comforting investors that OVTI was executing to plan on 8 MPx sensors for Apple's new product offering, re-inflating OVTI's stock trading price. ¶¶ 127-29. Defendants continued to mislead analysts and investors until late in the Class Period, as reflected in Craig-Hallum's report following the company's August 25, 2011 call with OVTI: "***management insists*** that these technical issues [with its 8 MPx CMOS sensor] have not caused OVTI to lose any

[12] *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 879-90 (9th Cir. 1994) and *Jensen v. Kimble*, 1 F.3d 1073, 1078 (10th Cir. 1993) cited by Defendants, (MTD at 16) address instances in which plaintiffs were aware that certain information would not be disclosed and thus are not analogous to the present case at all.

additional share at ***Apple*** and that the ***relationship remains intact***." ¶ 144. When the truth emerged, analysts felt deceived. *See,* ¶¶ 167, 174-75. Certainly, if professional analysts took the bait regarding OVTI's position with respect to the 2011 iPhone, the Court cannot rule as a matter of law that Defendants' statements did not mislead a "reasonable investor" with respect to Apple's 2011 iPhone, as they maintain. *See, Reese*, 643 F.3d at 691.

Nor are Defendants' statements merely inactionable "puffery," expressions of "optimism," or "opinion." MTD at 14. Again, Defendants' statements must be viewed in the context in which they were made. General positive statements may be misleading when "considered in conjunction with [the] other alleged misrepresentations ***and omissions***," because "[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Beloit Corp. v. Emett & Chandler Cos., Inc.*, No. 90-55154, 1991 WL 153459, at *3 (9th Cir. Aug. 14, 1991) (emphasis added), ("very adequate" or "a sure thing") (citation and internal quotation marks omitted). More pointedly, in *Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*, No. 09-CV-00882-WJH, 2011 U.S. Dist LEXIS 35661 (M.D. Tenn. Mar. 31, 2011), the court upheld a complaint based, *inter alia*, on the company's statements it was "***well positioned***" for future significant growth. *See also, In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418 (E.D. Pa. 2002) (statement that "[t]here are additional design wins coming" is "not immaterial puffery"); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1348 (S.D. Cal. 1998) (reference to "design wins" actionable where context of statement could "mislead investors").

The market reaction to Defendants' statements demonstrates that they were not mere puffery. To qualify as puffery, a statement must be so exaggerated or vague that no reasonable investor would rely on it when considering the total mix of available information. *See, In re Impac Mortg. Holdings, Inc.*, 554 F. Supp. 2d 1083, 1096-97 (C.D. Cal. 2008). Every time Defendants used the well-established buzz words — linked to "premium Tier One" customers and smartphones — while they concealed the truth, analysts knew they were referring to OVTI's

critically important CMOS sensor supplier position for the iPhone 4S. *See, e.g.*, ¶¶ 77, 79, 80, 84, 88, 92, 93, 96, 99, 100, 118. Such statements are more than specific enough to be actionable.[13]

Defendants mischaracterize this lawsuit as an attempt to hold them liable for simply failing to "predict" Apple's future decision to get optical sensors from another supplier. MTD at 14. Not so. Apple decided to replace OVTI with Sony as the lead supplier of CMOS sensors for the next-generation iPhone ***before*** the Class Period — and necessarily so given the long design to launch cycle and related milestone requirements. *See*, ¶¶ 57, 213-23. Defendants' heavy reliance on *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367 (D.N.J. 2010), is misplaced. Other than the superficial similarity of dealing with Apple iPhones, *Synchronoss* is patently distinguishable. In *Synchronoss*, plaintiffs were suing for a "false failure to project" that Apple would no longer offer its remote (off-site) activation feature in its new iPhone 3G. Synchronoss made that software. *Id*. at 407-08. There were no facts demonstrating that Synchronoss knew in advance that Apple decided to forego the activation feature in the future, but concealed such knowledge when it spoke. *Id*. at 382, 406-07. By contrast, given the extended design to launch cycle and related milestone achievements associated with the iPhone CMOS sensor supply contract occurring even before the advent of the Class Period, OVTI had objective barometers of where it stood with the 2011 iPhone that rendered Defendants' statements and omissions false and misleading – with *scienter*. And the *Synchronoss* plaintiffs did not specify the content of any statement by the defendants, or link any of the alleged positive rumors from unknown, unspecified sources to defendants that supposedly caused any market impression that the Synchronoss software would be used in the iPhone 3G. *Id*. at 377-

[13] Compare with *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal 2009) (statements about "strong demand," "increasing demand," and "continuing demand" for company's products were not too vague, where defendants concealed that one of company's largest customers would discontinue orders).

78, 405.[14] Here, the OVTI Defendants failed to disclose what had already occurred and deceived investors about its then-current position, while the *Synchronoss* defendants had to wait for Apple's future decision and simply did not predict what ***might*** occur.

### 2. Defendants' Statements Are Not Protected By The Safe Harbor

Defendants ignore the theory of Lead Plaintiffs' case involving present-tense statements and related omissions creating a false impression in the market about OVTI's then-current position regarding the Apple 2011 iPhone, arguing that the PSLRA's "safe harbor" respecting forward looking statements and projections insulates them from liability, citing two categories of statements: (1) revenue guidance in press releases of May 26, 2011 and August 25, 2011 (MTD at 9) and (2) the ramping up mass production timeline for OV 8820 and OV 8830 CMOS sensors (MTD at 11). First, Defendants' presumption that Lead Plaintiffs posit their claims on OVTI's revenue guidance in OVTI's May 26, 2011 press release is inaccurate. The Complaint, paragraph 117 and subparts (a)-(h), does no such thing, instead listing reasons why actionable present tense statements alleged at paragraphs 111-16 respecting the May 26, 2011 statements are false. In the May 26, 2011 press release and follow-on quarterly conference call (¶¶ 111-16), Defendants continued to make misleading present tense statements, further concealing the adverse truth about OVTI's devastating loss of position with respect to the 2011 iPhone. The same can be said regarding the August 25, 2011 press release and conference call wherein Defendants, though giving disappointing guidance that itself was a partial revelation of OVTI's adverse position, still concealed the truth and uttered deceptive and false present tense statements. *See, e.g.* ¶¶ 136-142(a)-(g); 143 (a)-(c), 144-56. There is no safe harbor issue in this regard.

Second, statements about the production timeline for OV 8820 or OV 8830 CMOS sensor products do not fall within the safe harbor. For example, when read in context — and as

[14] The complaint in *Synchronoss* contradicted itself on basic facts, *see id*. at 376-77, or conjured others, *see, e.g., id*. at 419. Nor did it involve embedded milestones. Unlike OVTI, Synchronoss did not have to source and order component parts (¶ 219), meet production and design milestones (¶ 222), receive a purchase order within a certain date (¶ 220), or achieve manufacturing yields. ¶¶ 214, 222.

the Complaint makes clear — statements about ramping up mass production in the "second half of calendar 2011,"[15] effectively link OVTI's CMOS sensor product "targeted to premier brand name smartphone OEM's" (¶ 115) to Apple's iPhone 4S given the 2011 iPhone's scheduled product cycle within that relevant time frame. A complaint that contains "aspirational" language is not necessarily forward looking. Nor are "statements couched in the future tense, but whose effect is to convey information about the present" afforded safe harbor protection. *South Ferry LP, #2 v. Killinger*, 399 F. Supp. 2d 1121, 1131 (W.D. Wash. 2005). Further, the challenged statements about production must be read in conjunction with what are misrepresentations and omissions of existing material facts — they should not be parsed from the present tense statements. *See, In re SunPower Sec. Litig.*, No. C 09-5473 RS, 2011 WL 7404238 at *5 n.6 (N.D. Cal. Dec. 19, 2011) (holding that because the complaint "unquestionably include[d] alleged misrepresentations of existing material fact, further parsing of exactly which statements or portions thereof might or might not be actionable is not appropriate at this juncture"). Nor does the safe harbor apply to ***omissions*** of present or historical fact, which coursed through the Class Period. *See, Mallen v. Alphatec Holdings, Inc.*, No. 10-cv-1673-BEN(MDD), 2012 U.S. Dist. LEXIS 39416 at *34-35 (S.D. Cal. Mar. 22, 2012).

Even assuming, *arguendo*, that such statements are forward looking, Defendants failed to provide adequate meaningful cautionary language to evoke the safe harbor protection. "Dismissal on the pleadings under the bespeaks caution doctrine [codified by the PSLRA's safe harbor (15 U.S.C. § 78u-5(c)(I))]... requires a ***stringent showing****:* There must be sufficient 'cautionary language or risk disclosure [such] that ***reasonable minds could not disagree that the***

[15] Defendants made several comments like this. *See, e.g.*, ¶ 86 (VP Cisneros: describing pleasure "with our engagements with Tier 1 leading customers to adopt Omni BSI-2" and stating that "[a]ll that being said ***we're lining up for***" ramp up of production by "the latter half of the Q2, Q3 timeframe calendar year next year"); ¶ 98 (VP Cisneros: "[***W***]***e remain on schedule, as we execute*** the planned transition from sample volume to mass production of the OV 8830 in the second half of calendar 2011 …8 megapixel… positioned… for… key markets, including the smartphone …key customers are working with us…"). These are not forward looking. *See, In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 816-18 (N.D. Cal. 2000) (statements that company was "on track" to meet revenue estimates not forward looking).

***challenged statements were not misleading***." *Livid Holdings Ltd.* v. *Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005) (citations omitted) (emphasis added). Cautionary language must relate directly to what plaintiffs claim misled them. (*see*, *In re LeapFrog Enters, Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007)), and must "discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005). Blanket or boilerplate disclaimers will not suffice. *Id.* at 1035. With respect to the two press releases (¶¶ 83, 95), Defendants point to boilerplate disclaimers about "potential errors, design flaws or other problems with the [product], customer acceptance, demand." MTD at 11. And as to the four conference calls during the Class Period, *see* ¶¶ 86-87, 98, 115-15, 136-39, Defendants claim that they directed investors to review SEC filings, which identified "accurately forecast[ing] customer demand" and "acceptance of the Company's products" as risk factors. MTD at 11-12. None of these cautionary statements directly disclose or address the ***then present facts*** rendering Defendants' statements and omissions fraudulent: OVTI's loss of its exclusive and dominant supplier position for the Apple iPhone. *See Berson*, 527 F.3d at 987 ("One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently.").[16]

### 3. Lead Plaintiffs Plead Sufficient Detail to Attribute Statements Made Through Analysts to Defendants

Under the so-called "conduit" theory, "liability can attach when a defendant directly provides false or misleading information to an analyst with the intent that the analyst will communicate the information to the market." *In re CV Therapeutics, Inc. Sec. Litig.*, No. C 03-

[16] "If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading." *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003); *accord Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1191 (N.D. Cal. 2008). *See also, Am. West.*, 320 F. 3d at 937 n. 15. Defendants knew but did not disclose that OVTI had lost its coveted position vis-à-vis the 2011 iPhone 4S. The status quo adversely changed. *See* Part D below.

03709 SI, 2004 U.S. Dist. LEXIS 17419 at *35 (N.D. Cal. Aug. 5. 2004), *citing Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997).[17] Lead Plaintiffs do not have to plead "exact quotations." *Oracle*, 380 F.3d at 1235. The holding of analyst meetings and conference calls is sufficient to show that Defendants intended their statements to be communicated to the market. *In re Apple Computer, Inc.*, 243 F. Supp. 2d 1012, 1028 (N.D. Cal. 2002).

Lead Plaintiffs have attributed numerous statements communicated to the market via analysts to specific Defendants. *See* ¶¶ 79-80 (analyst reports following calls with CFO Chan); ¶ 96 (analyst report based on company press release); ¶¶ 127-28 (analyst reports following discussions with CFO Chan and noting that "CFO states . . ." and "CFO reminded us . . . ."). While Defendants' challenge the attribution of a handful of statements, *see* MTD at 8 n.13, even a cursory reading of the Complaint undercuts their argument. For example, paragraphs 99 and 100 refer to statements regarding design wins - statements specifically attributed to VP Cisneros in paragraph 98. Paragraph 118 addresses statements attributed to CEO Hong and VP Cisneros in paragraphs 111-15. Defendants' challenge to paragraph 128 is especially specious, as paragraph 128 quotes an analyst report stating, "[W]e hosted a conference call with OVTI's CFO Anson Chan." Paragraphs 128 and 129 simply serve to confirm the statements attributed to CFO Chan in paragraph 128. This attribution is more than sufficient.[18] At the pleading

---

[17] The Supreme Court's ruling in *Janus Capital Group Inc., v. First Deriv. Traders*, ___ U.S. ___, 131 S. Ct. 2296 (2011), which addresses the liability of the parent company of a mutual fund which assisted in the preparation of statements made by the mutual fund, does nothing to disturb that. *See* MTD at 7. Courts have rejected efforts to expand the Court's holding in *Janus* to address other circumstances. *See, e.g., In re Merck & Co., Inc. Sec. Deriv. & "ERISA" Litig.*, No. MDL 1658 (SRC), 2011 U.S. Dist. LEXIS 87578, *100 (D.N.J. Aug. 8, 2011) (refusing to read *Janus* to insulate an officer for liability for statements made by the company); *City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395 (S.D.N.Y. 2011) (holding that *Janus* does not insulate defendants from liability for material omissions).

[18] Defendants argue that Lead Plaintiffs do not adequately allege that they adopted or put their "imprimatur" on analysts' own projections. MTD at 7-9. But this is not Lead Plaintiffs' theory. The Ninth Circuit has clearly distinguished between the imprimatur and conduit theories. *See, e.g., Oracle*, 380 F.3d at 1234-35 (distinguishing cases that "address projections made by third parties, not statements (including forecasts) made by defendants and communicated via third parties"); *Cooper*, 137 F.3d at 624 ("*Stac* and *Syntex* did not consider whether corporate defendants could be directly liable for misrepresentations to securities analysts. Instead, the issue in *Stac* and *Syntex* was whether corporate defendants could be held liable for analysts' interpretations of defendants' truthful statements." (citation omitted)).

stage, direct attribution to individual defendants is not required. *See, CV Therapeutics*, 2004 U.S. Dist. LEXIS 17419 at **34-36 (analyst reports referring to "meeting with management" and "corporate presentation" and reiterating "information provided by management" and "repeated information provided by management" found sufficient);[19] *In re Tut Sys. Sec. Litig.*, No. C 01-02659 CW, 2002 U.S. Dist. LEXIS 27092 at **17-18, 48 (N.D. Cal. Aug. 15, 2002) (analyst report that "the company maintains its customers are all in solid financial condition," following conference call with "Tut's management," found sufficient); *Hayley v. Parker*, No. SACV 01-0069 DOC, 2002 U.S. Dist. LEXIS 4849 at **20-21 (C.D. Cal. Mar. 18, 2002) (analyst report based on "presentations hosted by PETsMART management," including individual defendants, found sufficient); *In re Versant*, No. C 98-00299 CW, 2001 U.S. Dist. LEXIS 25009 at **24-25 (N.D. Cal. Dec. 4, 2001) (allegations that "Versant executives, including [an individual defendant]" met and told something to analyst found sufficient).[20]

**C. Confidential Witness Allegations are Sufficiently Pleaded**

Lead Plaintiffs satisfy the pleading standard for a confidential witness if they "number each witness"; describe "his or her job description and responsibilities"; provide each witnesses' time of employment; set forth each "witnesses' exact title"; and allege "to which . . . executive the witness reported." *In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005). The allegations must support the probability that the confidential witness possesses the information alleged. *Id.* at 1015; *see also, SeeBeyond*, 266 F. Supp. 2d at 1159 (PSLRA requirements met where "[t]he confidential sources each appear to have held a significant position at the company, and the information attributed to each does not appear unreliable or clearly beyond the type of knowledge that each source might have").[21]

---

[19] The statements quoted from paragraphs 88 and 95 of the *CV Therapeutics* complaint are excerpted in Exhibit 2 to the Declaration of Samuel M. Ward filed herewith.

[20] The Court may infer that analyst reports referring to OVTI "management" originated with CEO Hong. According to OVTI's former Director of Investor Relations, all information being disseminated to the investing public required CEO Hong's approval. ¶ 208.

[21] Defendants' hearsay objection goes too far. CW 2 and CW 6 give eyewitness accounts, reliable under any standard. ¶¶ 125, 200. And "even under the Reform Act, plaintiffs are only

Defendants challenge the reliability of certain confidential witnesses ("CW") who left OVTI prior to or early in the Class Period. MTD at 19. However, courts have found confidential witness testimony reliable when that testimony is temporally related to the person's employment. *See, In re Gilead Scis. Sec. Litig.*, No. C 03-4999 SI, 2009 U.S. Dist. LEXIS 46751 at *11 (N. D. Cal. June 3, 2009) (refusing to discount CW's "allegations about his/her own experiences," such as pre-Class Period sales or meetings); *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 U.S. Dist. LEXIS 52365 at *32 (C.D. Cal. July 1, 2008) (finding CW testimony regarding defendants' "active role in monitoring and maximizing [] revenues" reliable, even though CW left company prior to Class Period).[22]

Confidential witnesses have particular credibility when their allegations buttress each other. *See, United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th Cir. 1989); *In re Gilead Scis. Sec. Litig.*, No. C 03-4999 SI, 2009 U.S. Dist. LEXIS 95072 at **8-9 (N.D. Cal. Oct. 13, 2009). The testimony of the CWs and Expert A, *see supra* § III.B., serve to buttress each other, and Defendants' piecemeal attacks should be denied. Defendants contend that the Complaint lacks sufficient detail to support CW 3's allegation that the Individual Defendants would have known of CMOS sensor production problems. MTD at 20, *quoting* ¶¶ 192-93. However, CW 3's assertions are bolstered by OVTI's public statements (*see* ¶ 196) (CEO Hong stating "the smartphone is our number one priority"), and CW 6, who observed CEO Hong's participation in a meeting with Apple representatives (¶ 200), and application of the "core operations inference," discussed below in § IV D(1). Defendants misstate the allegations from

---

required to plead facts, not to produce admissible evidence." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). Hence, "that a confidential witness reports hearsay does not automatically disqualify his statement from consideration." *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188, 1189 (N.D. Cal. 2010), *quoting Zucco Partners*, 552 F.3d at 997 n.4.

[22] Defendants' cases are readily distinguishable. In *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008) (MTD at 19 n. 44), the court took issue with plaintiffs' failure to identify the temporal relationship between the false statements and the CW allegations. *Id.* at 1200-01. In *Zucco Partners*, (MTD at 19 n.3), the CWs were discounted because one "had no firsthand knowledge" of the relevant facts and the second was relied on in support of facts alleged to have happened approximately two years *after* he left the company. 552 F.3d at 996-97.

CW 1. MTD at 19. CW 1 provides first-hand evidence that before the CP, there were internal discussions at OVTI addressing the Sony incursion and ability to execute and meet Apple's requirements. ¶ 58.

Defendants' challenge to the testimony of CW 2 regarding the June 2011 return of a CMOS sensor from Apple as incompatible with its new iPhone also fails. ¶ 125. The late Class Period CMOS sensor return is not the vague "problem[]" rejected by the Ninth Circuit in *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001), nor is it relevant to the "early developmental stages" addressed in *Allison v. Brooktree Corp*., 999 F. Supp. 1342, 1348 (S.D. Cal. 1998). *See* MTD at 20 n. 48. Given the milestones embedded in the design to launch cycle, the inability of OVTI to have secured Apple's acceptance of its 8 MPx OV 8830 candidate for inclusion in its 2011 iPhone 4S as late as June 2011 evinces OVTI's dire lack of position and its failure to secure its most important supply contract with its most important customer. CW 2 is an eyewitness to that materially adverse event and is not relating vague or irrelevant adverse, albeit undisclosed, information.

### D. Factual Allegations Demonstrate a Strong Inference of *Scienter*

To plead *scienter*, a plaintiff must "state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987. "The inference that defendant acted with *scienter* need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' and the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." [23] *Tellabs*, 551 U.S. at 326, 328; *see also South Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). A complaint survives if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would

---

[23] In *Matrixx Initiatives*, 131 S. Ct. at 1324-25, the Supreme Court conducted a holistic review of the *scienter* allegations, so as to avoid "losing the forest for the trees." *See also*, *Frank v. Dana Corp*., 646 F.3d 954, 961 (6th Cir. 2011). A court "must take into account plausible opposing inferences but only those that "one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323-24.

"deem the inference of scienter ***at least as strong*** as any opposing inference." *Tellabs*, 551 U.S. at 326. To that end, *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement. *South Ferry LP, # 2*, 542 F.3d at 784.[24] Even were the Court to find that the plausible inferences equally favor Defendants, the inferences in Plaintiff's favor must prevail because, as the "Supreme Court has now made clear… a tie goes to the Plaintiff." *Commc'ns Workers of Am. Plan for Emples. Pensions and Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007).

### 1. OVTI's Apple iPhone Business Was a Core Operation with Embedded Design to Launch Milestones Providing a Strong Inference of *Scienter*

The factual allegations of the Complaint — required to be accepted as true, together with all reasonable inferences therefrom — demonstrate a "strong inference" of *scienter* that is "cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs*, 551 U.S. at 314. *Scienter* is especially evident when viewed in the context of the "core operations doctrine" embraced by the Ninth Circuit in *Berson*, 527 F.3d 982 and *South Ferry LP, #2*, 542 F.3d 776. Indeed, as in *Berson*, it would be "absurd to suggest" that OVTI's top management — the Individual Defendants — did not know when they spoke during the Class Period that the company was not positioned as the exclusive or even dominant CMOS sensor supplier for the 2011 Apple iPhone 4S. *See* 527 F.3d at 989. In *Berson*, where a stop-work order "halted between $10 and $15 million of work on the company's largest contract with one of its most important customers," the Ninth Circuit held that "[t]he size of the contract and the prominence of the client raise[d] a strong inference that defendants [the CEO and CFO] would be aware of this order" despite "no particular facts" indicating that the defendants knew about it.

---

[24] The Ninth Circuit has noted that its pre-*Tellabs* decisions, such as *Silicon Graphics, Vantive and Read-Rite* may have applied a *scienter* standard that was "***too demanding*** and ***focused too narrowly*** in dismissing vague, ambiguous, or general allegations outright." *South Ferry LP, #2*, 542 F.3d at 784. Such allegations must be considered.

527 F.3d at 987, 988 n.5. Here, the facts demonstrating Defendants' *scienter* are stronger and even more compelling.

OVTI's smartphone business was its "***number one priority***" — as CEO Hong admitted. ¶ 190. The CMOS sensor supply contract for the 2011 iPhone was a key, high profile contract with OVTI's premium, brand name, Tier-1 customer — Apple — a trend setting leader in technology in OVTI's constant focus and the subject of weekly meetings. ¶¶ 194, 199-205. OVTI's CMOS sensor supply contract with respect to Apple's iPhone offerings was vitally important to its success. Any loss of OVTI's exclusive or dominant CMOS sensor supply position with Apple would be – and was - a serious financial blow to the company. ¶ 202.[25]

OVTI maintained close contact with its customers — particularly Apple. CEO Hong remarked "we work closely with our customers at every stage of this product cycle." ¶ 196. OVTI had a "collaborative relationship" with its customers, "work[ing] hand in hand sharing ideas with one another from product concept inception to product design and production and finally delivering of products to customers." *Id.* The Individual Defendants, particularly CEO Hong, were "hands on" and deeply engaged in the daily management of OVTI CMOS sensor design win efforts, production and customer relations. *See* ¶¶ 191-98. The OVTI sales force and CEO Hong were involved in regular conversations with Apple. ¶ 203. And OVTI's role as the supplier for the 2011 iPhone 4S received considerable market attention and scrutiny. ¶¶ 77, 79, 88, 96, 108, 118, 126-29, 133, 135, 143-44, 147, 151, 154-55, 206-07.

Lead Plaintiffs' demonstration of *scienter* relies on additional facts. A strong inference of *scienter* is buttressed by the fact that the 2011 Apple iPhone design-to-launch cycle was

---

[25] OVTI's highest-profile supply contract prior to the Class Period was as the exclusive supplier of sensors for Apple's 2009 iPhone 3GS and 2010 iPhone 4. ¶¶ 47, 53. This business helped OVTI rebound from the global economic crisis. ¶ 50. The mobile phone segment of OVTI's CMOS sensor business accounted for 60-65% of its revenues in FY 2009-2011. ¶ 190. A large portion of this revenue was the product of smartphone CMOS sensor supply, like the iPhone. ¶ 206. From 3Q of FY '09 to 1Q of FY '10, OVTI revenue rose from $80.46M to $193.1M, and GAAP net income rose from a negative ($0.36) per share to $0.30. ¶ 50. In fact, OVTI suffered a devastating blow after Sony supplanted it as the exclusive and dominant supplier for the 2011 iPhone 4S, (from 2Q to 3Q of FY '12, OVTI revenue dropped from $217.9M to $185.2M and GAAP net income from $0.35 to $0.00 per share). ¶¶ 63, 180.

prolonged — necessarily so. Embedded within that process were important periodic milestones, with major milestones occurring before the Class Period, including Apple's issuance before the commencement of the Class Period of a purchase order commitment after certain prior design and engineering milestones were satisfied. ¶¶ 209-22.[26] The fact that Defendants knew OVTI had lost the exclusive or even dominant role as the supplier of CMOS sensors for the iPhone 4S prior to the Class Period is strongly inferred from the passage of the essential milestones in the design to launch cycle — periodic red flags. ¶¶ 209, 221. Apple's procurement process for the iPhone 4S began in early 2010. ¶ 213. Sony gained the 2011 iPhone CMOS sensor slot, dislodging OmniVision from its once exclusive perch, by at least April 13, 2010. ¶¶ 59, 61. In the June/July 2010 time frame, Apple would have placed purchase order contracts in specific quantities with its selected suppliers, thus marking an event, pre-class period, by which OVTI would have known of its lost position of dominance. ¶ 220.

In addition, as important milestone dates passed OVTI by, its 8 MPx CMOS sensor offerings — initially the OV 8820, based on its BSI technology, announced November 2010 and thereafter, the OV 8830, based on its BSI-2 technology, announced February 2011 — did not really get off the ground with Apple. ¶¶ 97, 125, 165, 173. Certainly, Apple's return of OVTI's newer 8 MPx BSI-2 architected OV 8830 in June 2011 because it was incompatible with the 2011 iPhone 4S raises a strong presumption of *scienter* given that it constituted yet another red flag regarding OVTI's most important supply contract with its key, iconic customer so vital to its consequent financial success. ¶ 125.[27] These abundant facts and inferences therefrom

---

[26] The critical milestones associated with the iPhone design-to-launch cycle are detailed in the Complaint by a highly experienced, credentialed, supply chain expert, who further establishes what they entailed and would have certainly imparted to OVTI management. These detailed allegations are the product of Expert A's valuable years of supply chain expertise and iPhone specific knowledge obtained through independent investigation. ¶¶ 210-13.

[27] The fact that Apple returned the incompatible OV 8830 sensor to OVTI in June 2011, ¶ 125, demonstrates that OVTI was still unable to achieve embedded milestones. It does not contradict Lead Plaintiffs' allegations, as Defendants' claim. MTD at 20. Lead Plaintiffs allege that while losing its exclusive supplier position before the Class Period, OVTI struggled toward at least performing a secondary or back-up position, while also hoping Sony failed to meet Apple's expectations. *See* ¶¶ 11, 72, 101. OVTI could not produce an acceptable sensor within

compel but one conclusion — the Individual Defendants knew the adverse truth – OVTI's major loss to a competitor – that they concealed from the market.

Indeed, when rumors were starting to percolate in the market that Sony, not OVTI, had won the contract for the 2011 iPhone CMOS sensor supply — rumors that were true — Defendants did not hesitate to immediately squelch them, falsely convincing analysts that it was not so, and thus further demonstrating Defendants' intent to deceive. In "management access" and conference calls on July 6, 2011, immediately following rumors circulating on or near July 5, 2011 that Sony had succeeded where OVTI had failed, Defendants, via CFO Chan, comforted the market that all was well and OVTI was "on track" to deliver to "Apple," (¶¶ 127-28), in close proximity to completing their insider selling campaign from May 31, 2011 through July 5, 2011 – much of which took place from June 29 to July 5, 2012 – and only weeks away from the radical earnings guidance reduction of August 25, 2011 — a partial disclosure, albeit still actively concealing the truth. ¶¶ 137-40.

Defendants attack "Expert A," in part because Expert A does not profess to having had specific experience with manufacturers of CMOS sensors. MTD at 21-23. The attack is misguided. First, Expert A conducted an investigation specifically related to the iPhone 4S and expressly states design cycle dates that are the product, *inter alia,* of such investigation. ¶ 213. This is not, as Defendants claim, merely an "opinion in the form of generic market data — without more." *See, In re Silicon Storage Tech., Inc. Sec. Litig.*, No. C-05-0295 PJH, 2007 U.S. Dist. LEXIS 21953 at *91 (N.D. Cal. Mar. 9, 2007); *see also, In re Textainer P'ship Sec. Litig.*, No. C-05-0969 MMC, 2007 U.S. Dist. LEXIS 5283 at **17-20 (N.D. Cal. Jan. 10, 2007) (consultants opinions supplied a factual basis for § 14(a) claim where it explained analysis and information relied upon). Second, the reliability of Expert A is apparent. Expert A possesses a Bachelor of Science Degree in Business Logistics and an MBA. ¶ 212. A global supply chain management consultant, Expert A has over twenty-five years of experience and has assisted

---

a month of the initial launch date and four months of the actual launch date, and was not truly well positioned as Defendants professed regarding the 2011 iPhone supply contract.

more than eighty clients in all aspects of supply chain management, including purchasing and procurement, with extensive experience in the processes by which businesses develop suppliers, procure goods and manage suppliers. ¶¶ 210-12. Expert A has consulted with clients in the high technology and consumer electronics industries about purchasing and supplier processes and has worked with and for numerous companies with manufacturing operations, including China. *Id.* This deep background lends gravity to the milestone allegations which are the product of, *inter alia*, Expert A's investigation with respect to Apple's iPhone. Expert A does not have to have designed, manufactured or managed the supply chain for an iPhone, or for the manufacturer of a CMOS sensor, for the product of Expert A's investigation, experience, expertise and analysis to be credited as sufficiently reliable to support *scienter* (or falsity), and it certainly does not preclude Expert A's detailed milestone based report.[28] ¶¶ 213-22. The weight to be given Expert A's informative report and opinions is a matter for the trier of fact to assess.[29]

### 2. Insider Trading Demonstrates a Strong Inference of *Scienter*

Insider trading can establish *scienter*. *Ronconi*, 253 F.3d at 434. Courts consider (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *See*, *id.* at 435. Here, applying these factors demonstrates a strong inference that the Individual Defendants knew but did not

---

[28] *See, e.g.*, *Cadence*, 692 F. Supp. 2d at 1188 ("as an established industry consultant, CW 12's livelihood depends upon his access to reliable, specific industry information…" (footnote omitted). *See also, Hungarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (witness experienced in insurance industry qualified to testify about bad faith denial of claim, despite lack of experience in claims adjustment standards and bad faith conduct).

[29] Other allegations support Expert A's reliability. The April 13, 2010 Rodman and Renshaw report that OVTI lost the 8 MP camera design for Apple to Sony is consistent with Expert A's timeline. ¶¶ 59, 215, 221. In the lead up to the 2010 iPhone 4, launched June 2010, VP Cisneros noted a "9 to 12 month incubation period" for mobile phone related products going to "Tier One companies," – an extended design cycle. ¶¶ 223-24. OVTI exploited the long design cycle to convince the market that its competitors could not catch up to it. After a "management call" on September 16, 2010, a Wedbush analyst was convinced of OVTI's "sole source position in the next gen. iPhone" partly because of the "year long design cycle for smartphones." ¶ 79.

timely disclose that OVTI was not in position as the exclusive or lead supplier of CMOS sensors for the new iPhone 4S – a devastating loss. ¶ 57. Using this information, Defendants unloaded over $15 million of OVTI common stock before the disclosure of the truth and at prices near the Class Period high. *See*, ¶¶ 181-82, 186. More than 87% of the sales occurred on just five trading days – June 15, 2011 and the four trading days from June 29 to July 5, ending right before the July 6, 2012 effort to squelch rumors that OVTI had lost the iPhone contract to Sony. ¶¶ 127, 186.

Defendants' argument that courts require sale amounts of over 37% of holdings to support scienter is mistaken. MTD at 15 n.60. Sales of twenty percent or less of a corporate insider's shares, when combined with other probative circumstances, may raise suspicion. *See Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (finding sale of 20% of holdings raised inference of scienter where sales occurred during two-month period between misleading statement and corrective disclosure); *Batwin*, 2008 U.S. Dist. LEXIS 52365 at *44 (though one defendant sold only about 7% of his total holdings, court found sales suspicious because of timing and inconsistency with prior trading history); *Marksman Partners, L.P. v. Chantal Pharm. Corp*., 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (finding sale of 20% of holdings for net proceeds of $6,300,000 supported scienter); *McCarthy v. C-COR Elecs. Inc*., 909 F. Supp. 970, 978-79 (E.D. Pa. 1995) (finding sales of between 15% and 20% of holdings roughly one month before corrective disclosure raised inference of scienter.

Indeed, in *In re OmniVision Techs., Inc*., No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009 at **14-15 (N.D. Cal. July 29, 2005) ("*OmniVision I*"), Judge Conte found defendant Hong's sale of 18% of his shares during the class period, compared to only 7% of his shares beforehand, probative of *scienter*. The court also found the timing of the sales and the inconsistency with prior trading history suspicious. *Id.* Compared with *OmniVision I*, CEO Hong's stock sales here, totaling 80% of his shares and 52% of his exercisable options, easily

give rise to an inference of *scienter*.[30] ¶ 187. In addition, Defendant Chan sold more than 30% of his available stock and options and Defendant Cisneros sold virtually all of his stock and options. *Id.* Even after tweaking the numbers,[31] the Individual Defendants concede that they sold at least 42% of their pre-Class Period holdings during the Class Period. *See* MTD at 24.

The timing of the sales is highly suspicious. More than 87% of the Class Period sales occurred in just five trading days: June 15, 2011, and the four trading days between June 29, 2011, and July 5, 2011. ¶ 186. OVTI's share price reached a high of $36.42 per share on May 26, 2011. ¶ 30. As the truth was revealed following OVTI's partial disclosure on August 25, 2011, its price plummeted to $14.26 per share by November 7, 2011. ¶¶ 136, 145, 169, 186.[32] CEO Hong and CFO Chan received more than $30 per share for ***all*** of their Class Period sales, as did VP Cisneros for most of his Class Period sales. ¶ 185.

Finally, the Individual Defendants' Class Period stock sales are dramatically out of line with their sales in the 452 days (15 months) immediately prior to the Class Period ("pre-Class Period"). The Ninth Circuit has held that a 10-month trading history is sufficient for judging *scienter*. *Id.* at 941. Neither Chan nor Cisneros sold ***any*** shares in the pre-Class Period. ¶ 181. This compares to sales of $3,309,500 and $2,716,854 of stock, respectively during the Class Period. *Id.* CEO Hong only sold 46,954 shares outside his 10b-5 trading plan pre-Class Period

---

[30] Defendants' reliance on 10b5-1 trading plans is misplaced. MTD at 24. A Rule 10b5-1 trading plan adopted after the defendant becomes aware of non-public information will not dispel an inference of scienter. *See, Applestein v. Medivation, Inc.*, No. C-10-0998 EMC, 2011 U.S. Dist. LEXIS 92230 at *23 (N.D. Cal. Aug. 18, 2011). *See also, Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1184-5, 1191 (S.D. Cal. 2009) (stock sales supported *scienter*, where defendants adopted or amended 10b5-1 trading plans just months before corrective disclosures); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008). Suspiciously, CFO Chan did not adopt his trading plan until March 16, 2011, midway through the Class Period and long after passage of numerous embedded milestones. ¶ 184. For his part, CEO Hong stepped out of his trading plan during the Class Period to make dramatically larger out-of-plan sales. ¶¶ 182-83.

[31] Lead Plaintiffs' calculations factored in vested stock options. ¶187.

[32] The Ninth Circuit has found longer timing to be suspicious. *See, Am. West*, 320 F.3d at 939 & n.17 (timing suspicious where sales occurred within approximately three months of stock's decline).

(¶ 183), compared to selling 84,965 out-of-plan shares in the Class Period. ¶ 182. The Individual Defendants' suspicious insider selling at very advantageous prices is powerful indicia of fraud.

## V. CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss in its entirety, failing which, Lead Plaintiffs request leave to amend the complaint.

DATED: August 24, 2012

Respectfully submitted,

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
SAMUEL M. WARD

/s/ STEPHEN R. BASSER
STEPHEN R. BASSER

600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

BRANSTETTER, STRANCH & JENNINGS, PLLC
J. Gerard Stranch, IV
James G. Stranch, III

/s/ J. GERARD STRANCH, IV
J. GERARD STRANCH, IV

227 Second Avenue North, Fourth Floor
Nashville, TN 37201-1631
Telephone: (615) 254-8801
Facsimile: (615) 250-3937

*Co-Lead Counsel for Lead Plaintiffs Oakland County Employees' Retirement System, Laborers' District Council Contractors' Pension Fund of Ohio, and Woburn Retirement System and the Proposed Class*

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
ckeller@labaton.com
JONATHAN GARDNER
jgardner@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff Woburn Retirement System*

**SIGNATURE ATTESTATION**

Per General Order 45, Section X.B., I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/S/) within this efiled document.

/s/ STEPHEN R. BASSER
STEPHEN R. BASSER