**E-FILED on** ___3/29/13___

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re OMNIVISION TECHNOLOGIES, INC. SECURITIES LITIGATION | No. C-11-5235 RMW |
| | **ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT** |
| This Document Relates To: | |
| ALL ACTIONS. | **[Re Docket No. 121]** |

Defendants OmniVision Technologies, Inc. ("OmniVision" or "OVTI"), Shaw Hong, Anson Chan, and Aurelio "Ray" Cisneros move to dismiss the Consolidated Class Action Complaint ("Complaint"). Lead plaintiffs oppose the motion. On October 26, 2012, the court held a hearing to consider defendants' motion. Having considered the papers submitted by the parties and the arguments of counsel, and for the reasons set forth below, the court denies the motion.

## I. BACKGROUND

Lead plaintiffs Oakland County Employees Retirement System, Laborers' District Council Contractors' Pension Fund of Ohio, and Woburn Retirement System (the Institutional Investors Group) bring this class action on behalf of all purchasers of publicly traded common stock and securities of OmniVision between August 27, 2010 and November 6, 2011 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934. Compl. ¶ 1. For the

United States District Court
For the Northern District of California

1   purposes of deciding defendants' motion to dismiss, the court takes as true the factual allegations of

2   the Complaint, which may be summarized as follows:

3        Defendant OmniVision is a designer and manufacturer of complementary metal-oxide

4   semiconductor ("CMOS") sensors, which are used in digital cameras to convert an optical image

5   into electronic signals.  *Id.* ¶ 46.  OmniVision's CMOS sensors are used in mobile phones with

6   camera features, including "smartphones."  *Id.*  The individual defendants are, and at all relevant

7   times have been, senior executive officers of OmniVision: specifically, Shaw Hong ("Hong") was

8   Chief Executive Officer ("CEO"), President, and Chairman of the Board; Anson Chan ("Chan") was

9   Chief Financial Officer ("CFO") and Vice President of Finance; and Aurelio "Ray" Cisneros

10  ("Cisneros") was Vice President of Worldwide Sales.  *Id.* ¶¶ 38-40.

11       Prior to the Class Period, OmniVision experienced success from the inclusion of its CMOS

12  sensors in Apple, Inc.'s ("Apple's") high-profile, critically acclaimed 2009 and 2010 iPhone

13  products, the iPhone 3GS and iPhone 4, respectively.  *Id.* ¶¶ 47, 50.  OmniVision's CMOS sensors

14  were based on a new technology introduced by the company in 2008 known as "backside

15  illumination" ("BSI") architecture, which conferred improved light sensitivity and better color

16  reproduction than the prior technology.  *Id.* ¶ 48.  Defendants touted OmniVision's technological

17  lead and referred to it as a "differentiator" for customers.  *Id.* ¶¶ 2, 53.  Apple contractually

18  prohibited its suppliers from revealing that Apple was their customer, but OmniVision allegedly

19  used buzz phrases and code words to convey to the market that it was and remained Apple's

20  exclusive image sensor provider for the iPhone.  *Id.* ¶¶ 3-6, 51, 53.  Specifically, in discussing such

21  topics as customers, competitive lead, design wins, market share, and demand for its products,

22  OmniVision referred to, for example, "brand name," "Tier 1," or "key" customers in the smartphone

23  industry.  *Id.*  The market's understanding that OmniVision remained Apple's exclusive supplier was

24  re-confirmed when, in June 2010, *Chipworks* conducted a "tear-down" of the iPhone 4 and found

25  OmniVision's image sensor therein.  *Id.* ¶¶ 8, 56.

26       During the Class Period, defendants continued to make positive statements about such topics

27  as OmniVision's competitive lead, its new BSI-2 technology, market share, design wins, and its

28  relationship with "Tier 1" customers.  *See generally id.* ¶¶ 75-125.  Lead plaintiffs contend these

**United States District Court**
For the Northern District of California

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW
LJP/ALG                                                    2

statements led the market to believe that OmniVision remained Apple's exclusive image sensor supplier when in fact Sony, not OmniVision, had been chosen by Apple to be the dominant supplier of 8 MPx camera image sensors for the next generation 2011 iPhone (ultimately called the iPhone 4S). *Id.* ¶ 10, 57.

According to a confidential witness, it was known within OmniVision by early 2010 that Sony was seeking Apple's business. *Id.* ¶¶ 57-58. Sony sent a senior vice president with his family from Japan to live in Cupertino, California and spearhead a dedicated team of Sony engineers with the goal of delivering the image sensor component supply business for Apple's new smartphone; failure meant the senior vice president and the entire team would be terminated. *Id.* ¶ 57. In April 2010, an analyst report by Rodman & Renshaw briefly noted "our handset supply chain checks also reveal that OmniVision...has lost the 8 MP camera design at Apple (a 15-20% customer) to Sony." *Id.* ¶ 59. Lead plaintiffs allege, however, that due to defendants' numerous positive representations, the market did not believe this accurate report and OmniVision's stock price continued to rise. *Id.* ¶¶ 59-60, 64-68. To further support their theory that OmniVision had lost its exclusive supply contract with Apple for the iPhone 4S before the start of the Class Period, lead plaintiffs cite the opinion of a non-testifying expert consultant ("Expert A"). *Id.* ¶¶ 210-223. Expert A has over 25 years of experience in supply management and bases his opinions on his experience, expertise, knowledge of supply chain procedures, and investigation related to the iPhone 4S. *Id.* ¶¶ 210-213. Expert A opines that Apple's procurement process would have begun in early 2010 and—consistent with the timing of the Rodman & Renshaw report—Apple would have started looking into alternative suppliers no later than March or April 2010 after discussing OmniVision's problems with yield and quality. *Id.* ¶¶ 213, 215-216.

At the start of the Class Period, after the market closed on August 26, 2010, OmniVision reported its results for the fiscal first quarter of 2011 and Hong, Chan, and Cisneros participated in a follow-on conference call with analysts. *Id.* ¶¶ 75-76. Defendants touted the introduction of OmniBSI-2; called their BSI products a "key differentiator" that would "continue to be a decisive factor in securing further design wins" and referred to their lead over competitors, who were unlikely "to approach our current level BSI production capabilities within the short term"; and spoke

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW LJP/ALG

1   glowingly of OmniVision's "position with customers" and "strong market position." *Id.* After the

2   call, analysts echoed the positive sentiments, and at least one expressed confidence that

3   "[OmniVision] will maintain its sole source position in Apple's next gen products." *Id.* ¶ 77. Lead

4   plaintiffs allege numerous additional instances of positive statements by defendants followed by

5   analyst enthusiasm, including: a "Management Access Call" with Chan on September 16, 2010, *id.*

6   ¶ 79; an in-person meeting between analysts and Chan on September 28, 2010, *id.* ¶ 80;

7   OmniVision's November 9, 2010 announcement of a new 8 MPx CMOS image sensor designed for

8   the smartphone market and expected to enter mass production in March 2011, *id.* ¶¶ 83-84;

9   OmniVision's report of financial results and follow-on conference call on November 30, 2010, *id.*

10  ¶¶ 85-88; a press release on February 15, 2011, *id.* ¶¶ 95-96; a conference call with analysts on

11  February 24, 2011, *id.* ¶¶ 98-100; a meeting between Hong and analysts on March 7, 2011, *id.* ¶ 103;

12  OmniVision's report of fiscal fourth quarter and full year 2011 financial results and follow-on

13  conference call on May 26, 2011, *id.* ¶¶ 110-115, 118; and OmniVision's annual report filed on June

14  29, 2011, *id.* ¶¶ 120-122.

15      Meanwhile, rumors circulated in late December 2010 and early January 2011 that Sony was

16  planning to add significant CMOS image sensor capacity, but an analyst brushed them off, noting

17  OmniVision's professed lead from its BSI technology. *Id.* ¶¶ 91-92. After a January 10, 2011

18  meeting with OmniVision management, another analyst concluded that "the vast majority of design

19  decisions for calendar year 2011 smart phone models have been made" and "the biggest challenge

20  this year will be smoothly executing the manufacturing transition to BSI-2 rather than maintaining

21  share." *Id.* ¶ 93. Later, on April 1, 2011, Sony's CEO gave an interview in which he commented,

22  "[It] always puzzles me, why would I make Apple the best camera?" *Id.* ¶ 106. However, the

23  comments were not taken seriously and did not impact the market; some analysts even interpreted

24  the comment as indicating that an Apple-Sony "hook up was rather silly." *Id.* ¶¶ 107-108.

25      By the end of June 2011, lead plaintiffs contend, OmniVision had passed every critical

26  milestone in the iPhone 4S design cycle without achieving yields necessary to meet Apple's

27  production requirements, even as a secondary or back-up image sensor supplier. *Id.* ¶¶ 123-124.

28  According to a confidential witness, in June 2011 a prototype 8 MPx sensor was returned to

United States District Court
For the Northern District of California

1   OmniVision via rush delivery because it had malfunctions that rendered it incompatible with the

2   new iPhone. *Id.* ¶¶ 124-125. In early July 2011, a rumor began to circulate that OmniVision had

3   missed production milestones and lost its image sensor slot to Sony, but, after conversations with

4   company sources including Chan, analysts expressed continued confidence that OmniVision was

5   proceeding as expected, including with respect to Apple. *Id.* ¶¶ 127-129, 133. Nonetheless,

6   disclosure of the rumors caused OmniVision's stock price to decline from $34.67 on July 5, 2011 to

7   $22.44 on August 8, 2011. *Id.* ¶ 132.

8          On August 25, 2011, OmniVision reported financial results for its first fiscal quarter of 2012

9   and provided earnings guidance for the second quarter ending October 31, 2011. *Id.* ¶ 136.

10  OmniVision forecasted between $255 and $275 million in revenue, which was significantly below

11  the $306 million expected by analysts. *Id.* ¶¶ 135-136. In a follow-on conference call, defendants

12  stated the disappointing guidance was due to an unanticipated extension in the development of the

13  product cycle of the 8 MPx product line and "macroeconomic uncertainties." *Id.* ¶ 137. Hong and

14  Cisneros also gave positive portrayals of OmniVision's business, referring to "consistent positive

15  customer feedback," the needs of "premier brand name smart phone customers" that gave

16  OmniVision an "advantaged position," OmniVision's "leadership position in the smart phone

17  market," and design wins that "ensure that we will remain close to the premier players who will

18  drive the highly contested smartphone market." *Id.* ¶ 138. Lead plaintiffs contend that defendants'

19  references to an extended development cycle and OmniVision's plan to ramp up production at the

20  end of their second fiscal quarter (October 2011) falsely telegraphed to the market that Apple's delay

21  of the iPhone 4S launch from June 2011 to September or October 2011 was tied to OmniVision's

22  production cycle. *Id.* ¶ 140. Analysts on the call asked about whether OmniVision had suffered

23  share loss at their key accounts or in the smartphone market, but Cisneros declined to comment on

24  any specifics and simply emphasized OmniVision's plan to start delivering at the end of the second

25  fiscal quarter. *Id.* ¶ 141. Following the announcement and call on August 25, 2011, some analysts

26  began to speculate that OmniVision had lost up to 50% of its business from Apple but others

27  expressed the belief that OmniVision's position as sole supplier remained intact. *Id.* ¶¶ 143-144. In

28  one day of trading, OmniVision's stock price declined 30% on a large trading volume. *Id.* ¶ 145.

On September 1, 2011, an analyst spoke with Chan and reported that Chan "acknowledges that Sony is a credible competitor at 8MPx. That said, he believes OVTI has only gone head-to head with Sony once (so far) and claims that OVTI won the resulting design opportunity for a 2012 product." *Id.* ¶ 147. Similarly, Chan held a "Management Access Call" on September 20, 2011 after which analysts reported "Management believes OEM relationships remain unchanged; not dependent upon one customer. OVTI noted that in terms of its market share, the company believes its OEM relationships remain unchanged." *Id.* ¶ 149. In the days leading up to the iPhone 4S launch, analysts and the market continued to believe that OmniVision's was the exclusive or at least dominant supplier of image sensors, and defendants did nothing to refute that belief. *Id.* ¶¶ 150-151, 153-155. The iPhone 4S launched on October 7, 2011 and was a great success, selling over one million units in the first 24 hours. *Id.* ¶ 156.

On October 14, 2011, the iPhone 4S was officially released, and industry experts dismantled the product seeking to determine the manufacturers of its components. *Id.* ¶ 157. One expert, *Chipworks*, concluded that the iPhone 4S contained an image sensor made by Sony, rather than OmniVision; *Chipworks* added that other iPhone units may have sensors produced by other manufacturers. *Id.* ¶ 157. In reaction, OmniVision's stock price fell 9.3% on a large trading volume. *Id.* ¶ 158. Analysts, however, continued to speculate that OmniVision was or could become a second source supplier for the iPhone 4S. *Id.* ¶¶ 159, 161. Defendants' alleged failure to correct their prior misstatements allegedly caused continued distortion in OmniVision's stock price, which actually rose from $15.60 per share on October 17, 2011 to $17.31 per share on Friday, November 4, 2011. *Id.* ¶¶ 160, 162.

Finally, on November 7, 2011, OmniVision issued revised financial guidance, announcing projected revenue for its second quarter ending October 31, 2011 to be $212 million to $217 million, compared to the forecast of $255 million to $275 million announced on August 25, 2011. *Id.* ¶ 163. The announcement blamed "an unexpected cutback in orders for key projects" for the revised guidance. *Id.* OmniVision's lowered revenue guidance was allegedly viewed as an admission that it was not selected as an image sensor supplier for the iPhone 4S, further confirmed by the fact that iPhone 4S sales were doing extraordinarily well compared to OmniVision's reduced revenue. *Id.*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

¶ 164.  On the same day, an analyst relayed that OmniVision's 8 MPx product had only shipped in "very limited quantities" at the end of June 2011 and "mass production was not taking place, due to production delays." *Id.* ¶ 165.  OmniVision's stock price dropped to $14.26 per share at the close of trading on November 7, 2011 on a large trading volume. *Id.* ¶ 169.

In the wake of OmniVision's November 7 announcement and revelations about the image sensor used in the iPhone 4S, analysts commented on evasion and credibility problems in OmniVision's management. *Id.* ¶¶ 166-167, 174-175.  Meanwhile, on November 29, 2011, OmniVision announced even lower expected revenues, between $160 million and $180 million, for its fiscal third quarter. *Id.* ¶ 172.  In the follow-on call, Cisneros stated that there would be "further degradation in demand" and that OmniVision needed to "regain our momentum in the market place," emphasizing the smartphone market. *Id.* ¶ 173.  Chan stated that the BSI-2 products "are still in their initial rollout stage and yields are at a suboptimal level." *Id.*  Finally, in January 2012, Apple released a list of suppliers constituting 97% of its spending that did not list OmniVision, leading an analyst to conclude that "OmniVision has either lost all of its business to Sony or its business with Apple now is just a shadow of what it used to be." *Id.* ¶ 178.

## II.  ANALYSIS

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, lead plaintiffs must allege: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which they relied (5) which proximately caused plaintiffs' injury.  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002) (citation omitted).  Liability under Section 20(a) is established by showing that a primary violation of the Exchange Act was committed and that the defendant directly or indirectly controlled the violator.  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

In moving to dismiss, defendants argue that the Complaint does not adequately plead any actionable misstatements or omissions because no direct statements ever made reference to Apple or the iPhone 4S, they are not liable for statements made by analysts, and forward-looking statements are protected by the safe harbor.  Defendants further attack the Complaint's allegations of falsity and scienter.  Factually, defendants' arguments are directed to several related questions: (1a) When did

**United States District Court**
For the Northern District of California

1  Apple decide to use image sensors produced by Sony instead of OmniVision? (1b) When did defendants

2  find out, from Apple or otherwise? (2a) What information that was conveyed to the market is

3  attributable to defendants? (2b) What did defendants intend to or knowingly convey?  The court

4  addresses defendants' arguments in turn.

5        **A.**      **The Alleged Misrepresentations And Omissions**

6       Lead plaintiffs' theory is that defendants made statements to the market and to analysts that gave

7  the misleading impression that OmniVision was still the exclusive or dominant supplier of image

8  sensors to Apple, while avoiding any direct reference to Apple or the iPhone 4S.  Defendants argue that

9  the generalized statements are not actionable and that, because defendants never spoke about Apple or

10  the iPhone 4S, there was no duty to disclose.  Defendants also contend that the Complaint fails to

11  identify any actionable statements reported by analysts that are attributable to specific defendants.

12  Finally, the parties dispute the applicability of the safe harbor for forward-looking statements.

13        **1.**      **The *Synchronoss* Case**

14       Defendants rely heavily on *In re Synchronoss Securities Litigation*, 705 F. Supp. 2d 367 (D.N.J.

15  2010), which coincidentally also involved a company whose product was used by Apple in the iPhone.

16  Similar to this case, the plaintiffs alleged that (1) defendant Synchronoss experienced business success

17  thanks to a contract with Apple and AT&T to use its remote activation software in the original iPhone

18  and (2) the defendants then concealed from the market, *inter alia*, that its software would not be used

19  in the next generation iPhone 3G, which was not available for off-site activation.  The *Synchronoss* court

20  rejected those claims, finding that the plaintiffs had not alleged anything that "can qualify as a statement

21  falsely indicating that Synchronoss would be involved in activation of the iPhone 3G" nor any statement

22  that affirmatively misled the plaintiffs.  *Id.* at 405-07, 419-21.

23       It is instructive to compare the *Synchronoss* allegations with those lead plaintiffs make here:

24

25

26

27

28

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW
LJP/ALG

United States District Court
For the Northern District of California

| Allegations In *Synchronoss* | Lead Plaintiffs' Allegations |
|---|---|
| An alleged plan, prior to the class period, to widely publicize Synchronoss' original contract with Apple/AT&T using the term "the Apple iPhone," which the plaintiffs contended meant Synchronoss' software would be used in either all future models of the iPhone or, at the very least, in the iPhone 3G. 705 F. Supp. 2d at 405. | Prior to the Class Period, defendants "saturated the market" with statements about its design wins, particularly for smartphones, and its success with "Tier 1 customers," which lead plaintiffs contend was "an understood reference to Apple." Compl. ¶ 53. OmniVision was known to be the supplier of camera sensors for the iPhone 3GS and iPhone 4. Compl. ¶ 47. |
| Rumors about the upcoming release of the iPhone 3G, from which plaintiffs and certain financial analysts and/or journalists unrelated to the defendants deduced that the iPhone 3G would necessarily be available for off-site activation and that Synchronoss' software would be used for such activation. 705 F. Supp. 2d at 405. | Analysts' conclusions, although allegedly based in part on defendants' statements, drew from various sources. For example, multiple analysts referred to unspecified industry "checks" supporting their belief that OmniVision remained the exclusive supplier for the iPhone 4S. Compl. ¶¶ 79, 96, 108, 128, 143. |
| An officer's statement that "We are extremely pleased with the continued high level performance that our ConvergenceNow [program] has delivered [for the purposes of] activation of the Apple iPhone," which plaintiffs again extrapolated to future versions of the iPhone. 705 F. Supp. 2d at 405. | Defendants' touting of market demand for, and customer adoption of, OmniBSI and the success of OmniVision's BSI technology. Compl. ¶¶ 75, 86, 111, 121, 138. |
| Officers' statements that "we are more optimistic about [Synchronoss'] long-term future than at any point in our history," that "Synchronoss is well positioned to benefit from multiple growth opportunities," and that they were "optimistic about [Synchronoss'] ability to take advantage of those opportunities based on Synchronoss' unique ConvergenceNow." 705 F. Supp. 2d at 405-06. | Defendants' numerous statements about OmniVision's competitive lead and strong market position and its ability to continue garnering successes. Compl. ¶¶ 75, 85-87, 103, 111, 114-115, 121, 138. |

The *Synchronoss* court found that none of the allegations in that case "point out any *false statement by Defendants:* rather, all these allegations point to *false deducements made by Plaintiffs* and/or by the journalists and analysts upon those whose opinions Plaintiffs elected to rely." 705 F. Supp. 2d at 406. The court further found that the statements allegedly made by the defendants were puffery and rejected the plaintiffs' attempt to reinterpret them. *Id.* at 406-07. The *Synchronoss* court also addressed allegations, similar to those here, that the defendants actually knew but failed to disclose that they would not be involved in off-site activation of the iPhone 3G. The court first held that plaintiffs failed to plead any facts establishing defendants' knowledge, *id.* at 381-82, 408, 419, but

second stated that, even assuming the defendants possessed some knowledge that Synchronoss would not be involved in off-site activation, defendants did not make any false or misleading statements or have any duty to affirmatively disclose that information, *id.* at 420-21 (explaining that defendants were not required to affirmatively update prior statements because, based on its earlier analysis, "none of Defendants' statements . . . even mentioned the iPhone 3G (and, hence, there was no statement to update)").

The court finds this case very similar to *Synchronoss* with respect to the allegations that rely on lead plaintiffs' and analysts' (ultimately factually inaccurate) interpretations of defendants' statements. Where the plaintiffs in *Synchronoss* interpreted "Apple iPhone" to mean future versions of the iPhone, including the iPhone 3G, lead plaintiffs here must make an even greater leap with respect to the majority of the alleged statements: inserting "Apple" and "iPhone 4S" in place of generic terms like "customers" and "smartphones." The alleged statements by defendants referring to customers, plural, do not support an inference that Apple was OmniVision's only, or even majority, customer.[1] Lead plaintiffs have not alleged that the majority of defendants' statements are false without rewriting what was said. Boiled down, lead plaintiffs' theory is that (1) prior to the Class Period, defendants made numerous positive statements about OmniVision's business; (2) the time period of those statements corresponds to the separately-determined fact that OmniVision was supplying image sensors for Apple's iPhone 3G and iPhone 4; (3) therefore, because defendants continued making similarly generic, positive statements during the Class Period, the market was entitled to assume that OmniVision would continue supplying image sensors for Apple's new iPhone version. But, like in *Synchronoss*, that theory simply reflects the "false deductions" made by lead plaintiffs, not false statements made by defendants. 705 F. Supp. 2d at 420.

However, this case is distinguishable from *Synchronoss* in certain respects. In *Synchronoss*, the allegedly misleading statements were based on information that the defendants *might* have known about

---

[1] For example, OmniVision's revenue declined from $276.1 million to $217.9 million to $185.2 million in the three quarters surrounding the iPhone 4S launch. Compl. ¶¶ 171, 180. These allegations show that, while the revenue loss allegedly due to losing the sensor slot in the iPhone 4S was significant, OmniVision nonetheless continued to receive large revenues. *See also id.* ¶ 190 (noting that OmniVision's mobile phone segment, which included more than smartphones, accounted for up to 65% of its revenue).

the next generation iPhone based on Apple's problem with consumers "unlocking" their iPhones for use with multiple carriers. *See id.* at 407-08 (explaining that the claims were based on a "false failure to predict" that Apple would not longer offer defendant's feature). But the *Synchronoss* court concluded that plaintiffs failed to allege that defendant actually *knew* during the relevant time frame that Apple had decided to entirely forgo the off-site activation feature (that required Synchronoss's program) in its next generation phone. *See id.* at 381-82, 408, 419. In *Synchronoss*, if Apple had decided to retain the off-site activation program for the iPhone 3G, there appears to be no question that Synchronoss would be the supplier, and no allegations were sufficient to establish that defendants should have or even could have predicted Apple's internal decision to eliminate the off-site activation program before or during the Class Period. *See id.* Here, in contrast, there was no question that the next generation iPhone (iPhone 4S) would incorporate a CMOS sensor and there was no guarantee that Apple would award the contract for that feature to OmniVision. OmniVision was not the guaranteed choice or only possible supplier of the CMOS sensor, as were the *Synchronoss* defendants with respect to the off-site activation program. Defendants here were *at least* on notice that OmniVision was *competing* for a contract with Apple to supply the CMOS sensor.

More importantly, however, the *Synchronoss* court's analysis largely turned on the conclusion that the defendants statements were *not misleading*, and thus no analysis of falsity or scienter was even required:

> Plaintiffs invite this Court to find the Rule 9 /PSLRA degree of falsity in those statements of Defendants that *did not even mention* the alleged object of falsity. The court declines the invitaiton. Stripped of all niceties, Plaintiff's assertions . . . alleg[e] nothing more than Plaintiffs' bare disappointment with the fact that Plaintiffs' financial hopes (and the projections of the journalists and analysts whom Plaintiffs wanted to believe) turned out false. However, the law of securities does not equate the falsity of Plaintiff's projections (or the falsity of projections made by the press . . .) with the falsity of Defendants' projections.

*Id.* at 407. Although this same analysis applies here to the vast majority of the statements alleged, certain of defendants' alleged statements (discussed in Part II.A.4-5) *specifically* reference OmniVision's victory over its competitor, Sony, for a 2012 product, or specifically state that OmniVision's OEM relationships remained unchanged (after allegedly having lost the contract to Sony). As explained in more detail below, those particular statements actually would be false and misleading

1   if OmniVision had already lost the Apple contract to Sony at the time they were made.  Accordingly,

2   the court here must reach the issue of scienter.

3       Although the court finds the reasoning in *Synchronoss* persuasive with respect to the majority

4   of the allegedly false or misleading statements or omissions (*see* "Misleading Omissions," Part II.A.2

5   *infra*), which are too vague or forward looking to actually be false or misleading, the court finds that two

6   specific statements in this case *are* sufficiently alleged to be actually misleading (*see* Parts II.A.4-5

7   *infra*) and warrant further analysis.  Before turning to those specific statements, however, the court will

8   further explain why the majority of the alleged statements here are not actionable.

9                       **2.      Misleading Omissions**

10      As the *Synchronoss* court explained, "it is not enough to allege that [a] statement is incomplete;

11  rather, the plaintiff must state facts showing that, due to its incompleteness, the statement *affirmatively*

12  *led the plaintiff in a wrong direction* (rather than merely omitted to discuss certain matters)."  *Id.* at 419

13  (citing *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  *Brody* held that Rule

14  10b-5 does not contain "a freestanding completeness requirement":

15          No matter how detailed and accurate disclosure statements are, there are likely to be
            additional details that could have been disclosed but were not. To be actionable under
16          the securities laws, an omission must be misleading; in other words it must
            affirmatively create an impression of a state of affairs that differs in a material way
17          from the one that actually exists.

18  280 F.3d at 1006.  Here, defendants' alleged statements (with the exception of those discussed in Part

19  II.A.4-5) were consistent both with lead plaintiffs' deduction that OmniVision remained Apple's

20  exclusive or dominant supplier and with the opposite conclusion that OmniVision had lost its position

21  with Apple (but continued to do well in other markets or with other customers).  The alleged statements

22  themselves did nothing to affirmatively lead the market toward one conclusion over the other.  In fact,

23  the market was aware that Apple prohibited its suppliers from disclosing the relationship, and defendants

24  made explicit disclaimers that they could not discuss specific customers.  Compl. ¶¶ 3, 93, 141; *see*

25  *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 879-80 (9th Cir. 1994) (holding where "plaintiff 'knew

26  what he didn't know,' there was nothing misleading in the omission").

27      Lead plaintiffs are correct that whether a statement is misleading is a fact-intensive inquiry and

28  that context matters.  Nor is it sufficient for avoiding liability that a statement is literally true.  *See, e.g.*,

United States District Court
For the Northern District of California

*Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886-87 (9th Cir. 2008) (holding statements that the defendants expected to have their shares approved for quotation on the NASDAQ, while literally true, also conveyed the false impression that the defendant intended to actually list its shares on the NASDAQ). The court also recognizes that, compared to some of defendants' examples and cases in which there was no duty to disclose, the alleged statements here are closer to the subject of nondisclosure in that both relate generally to OmniVision's customer base. *Compare, e.g.*, *Brody*, 280 F.3d at 1006 (finding providing information about stock repurchase program was not misleading for failure to mention possible takeover) *with In re STEC Inc. Sec. Litig.*, 2011 WL 2669217 at *6-9 (C.D. Cal. 2011) (finding allegations sufficient where the defendants announced a $120 million agreement with one of the company's largest customers without disclosing that it was an exceptional, one-time purchase agreement not indicative of a new ongoing level of demand). Nonetheless, even statements on a particular topic do not always require complete disclosure of specific details. *Cf. Brody*, 280 F.3d at 1006 n.8 ("For example, if a company reports that its sales have risen from one year to the next, that statement is not misleading even though it does not include a detailed breakdown of the company's region by region or month by month sales."). Here, the allegations certainly support an inference that OmniVision's relationship with Apple was of great interest to investors and perhaps even that many investors would readily conclude that any discussion of "customers" would include Apple. However, in light of the fact that defendants never mentioned Apple specifically, and the disclosure that they could not and would not discuss specifics, the court finds that the Complaint fails to allege that the statements were misleading. The mere fact that defendants' statements did not disabuse lead plaintiffs or analysts of their conclusion that OmniVision remained Apple's supplier—a conclusion drawn from a combination of multiple sources—does not render the statements actionable.

Lead plaintiffs argue that analysts' interpretation of a statement can reveal its tendency to mislead, citing *STEC*, 2011 WL 2669217 at *8 ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed."). However, the statement cited by the *STEC* court was reasonably read as directly in response to and relying on the alleged misrepresentation in announcing the company's new contract. *See id.* (quoting analyst report that "we now expect rev from [that customer] alone of >$250M"). Here,

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW
LJP/ALG

United States District Court

For the Northern District of California

1   as noted above, the allegations reflect that there were many sources of information or rumors concerning

2   Apple's relationship with OmniVision, not all of which can be attributed to defendants.  Thus, analysts'

3   statements are only weakly probative of the reasonableness of lead plaintiffs' interpretation *of*

4   *defendants' actual statements*, particularly when analysts often stated only that conversations with

5   defendants left them more confident in, or did not change, prior conclusions, *see e.g.*, Compl. ¶¶ 118,

6   128, 133.

### 3.   Puffery

8        Moreover, even if defendants' alleged statements could mislead investors, the court agrees with

9   the conclusion in *Synchronoss* that statements of such a nature cannot result in liability for the additional

10   reason that they are mere puffery.  705 F. Supp. 2d at 406.  "Vague statements of opinion are not

11   actionable under the federal securities laws because they are considered immaterial and discounted by

12   the market as mere 'puffing.'"  *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998)

13   (citing *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 288-90 (4th Cir. 1993)).  Many courts have rejected

14   liability based on "vague[,] run-of-the-mill corporate optimism" including such language as: "we're the

15   leader in a rapidly growing market," "it's a great time for a company like ours," "we already have a

16   sizable lead over our competition," "we feel that [defendant] has a strong product set to pursue emerging

17   . . . opportunities," business remains "strong," and "these products will continue to position [defendant's]

18   solutions as best-of-breed for the evolving . . . market."  *E.g.*, *In re Copper Mountain Sec. Litig.*, 311

19   F. Supp. 2d 857, 868 (N.D. Cal. 2004) (citing *Wenger*, 2 F. Supp. 2d at 1245; *In re Gupta Corp. Sec.*

20   *Litig.*, 900 F. Supp. 1217, 1236 (N.D. Cal. 1994)).  The court finds no significant difference between

21   such statements and the vast majority of the statements alleged in the Complaint.

22        Lead plaintiffs argue that even statements that would be puffery standing alone can be actionable

23   when viewed in context, citing *Beloit Corp. v. Emett & Chandler Cos., Inc.*, 1991 WL 153459 at *3 (9th

24   Cir. Aug. 14, 1991).  Assuming the court may consider an unpublished Ninth Circuit case issued before

25   January 1, 2007, *see* 9th Cir. R. 36-3(c), *Beloit* is distinguishable.  That case found a representation that

26   reserves were "very adequate" could be more than puffery when considered in conjunction with other

27   specific misrepresentations, i.e., that the defendant had only performed one calculation of the reserves

28   when it had conducted numerous such calculations and that the defendant could not segregate loss data

by type. 1991 WL 153459 at *3. Similarly, *Casella v. Webb*, 883 F.2d 805 (9th Cir. 1989), from which *Beloit* drew the language quoted by lead plaintiffs, found that calling an investment "a sure thing" was actionable when viewed in the context of specific statements that the investment was an IRS approved tax shelter and that an investment of $41,000 over a three-year period would result in an income tax credit in an amount greater than the investment. *Id.* at 806-07, 808. Here, lead plaintiffs have not identified any representations that approach anywhere near the level of specificity reflected in the additional statements considered in *Beloit* and *Casella*. Lead plaintiffs only offer generic optimism that they contend must be considered in the context of yet more generic optimism, which does not render any of it more than puffery. The other cases cited by lead plaintiffs are unhelpful because they also involved specific statements that could be provably false. *See* Dkt. No. 128 at 16:14-21.

### 4.    Other Statements

Certain alleged statements, however, do contain somewhat more factual content than the language courts have considered to be puffery. For example, Cisneros stated on May 26, 2011 that OmniVision's new 8 MPx sensor "is being driven by demand from key customers, primarily in the smartphone market at the onset of the product launch." Compl. ¶ 113. And on August 25, 2011 Cisneros expressed satisfaction with OmniVision's design wins with new customers or projects "as they ensure that we will remain close to the premier players who will drive the highly contested smartphone market." *Id.* ¶ 138. However, having given these statements further consideration, the court finds them insufficient at least for the original reason: they fail to refer specifically to Apple and by their plain terms refer to multiple unspecified customers. Lead plaintiffs' and analysts' conclusion that Cisneros' comments at least in part referred to Apple is not attributable to defendants. *See Synchronoss*, 705 F. Supp. 2d at 406. There is also no allegation that OmniVision did not "remain close" to Apple despite losing the iPhone 4S sensor slot.

The court is also unpersuaded by the examples emphasized in lead plaintiffs' briefing. In particular, lead plaintiffs repeatedly rely on Chan's alleged statements to analysts on July 6, 2011 as an example of how defendants "buttressed [the misleading, positive impression they conveyed to the market] through one-on-one calls regarding the 2011 iPhone with certain analysts" and as an example of "obvious references made by [OmniVision] to its positioning with respect to Apple's 2011 iPhone."

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW
LJP/ALG
15

1   Dkt. No. 128 at 14:23-27, 14:17-21 (citing Compl. ¶¶ 127-129).  However, the analysts' reports belie

2   this characterization.  The reports clearly distinguish between information that came from Chan and the

3   respective analyst's own beliefs.  For example, JP Morgan analysts wrote:

> 4   *CFO states* that wafer orders are being submitted to TSMC, according to plan.  *We*
> 5   *believe* this implies the firm is ramping volume of BSI-2 product . . . .
>
> 6   . . . The *CFO reminded us* that the 8MPx BSI-2 product (OV8830) was made
>     available for sampling in February 2011, and the company stated that the product will
> 7   be made available in volume in the second half of 2011. . . . .
>
> 8   First take.  *We believe* OVTI remains on track to deliver BSI-2 product to tier 1
>     handset OEMs in F2Q12, including Apple.

9   Compl. ¶ 127 (emphasis added).  Similarly, Craig-Hallum analysts wrote:

> 10   Yesterday's rumors speculated that OVTI was experiencing yield issues and therefore
>      missed Apple's commercial production deadline for the next-gen iPhone.  *We don't*
> 11   *share this belief.  Management reiterated* that they still expect a significant ramp in
>      BSI-2 shipments in the second half of CY11.

12   *Id.* ¶ 128 (emphasis added).  In short, the statements attributed to Chan only deal with OmniVision's

13   general plans and expectations relating to production of BSI-2, specifically that BSI-2 would be

14   available in volume in the second half of 2011.  Lead plaintiffs have not alleged that such plans or

15   expectations were false.  *See id.* ¶ 131.  Although the analysts juxtaposed Chan's information with their

16   beliefs about OmniVision and Apple, there is not a sufficient connection between the two to infer that

17   Chan's actual statements did or were intended to refer to Apple or the iPhone 4S.

18       Lead plaintiffs also emphasized these paragraphs of the Complaint at the hearing, arguing that

19   Chan's statements were obviously in response to rumors that circulated in early July that OmniVision

20   had missed production milestones and lost its image sensor slot to Sony for the new iPhone.  *See id.* ¶

21   127.  The timing of the alleged statements also follows a period of what the Complaint alleges to be

22   heavy insider trading by Hong, Chan, and Cisneros.  *See id.* ¶¶ 130, 182, 184-186.  Lead plaintiffs

23   further pointed out that just the previous month, in June 2011, Apple had allegedly returned a prototype

24   8 MPx image sensor because it was malfunctioning rendering it incompatible with the new iPhone.  *Id.*

25   ¶ 125.  But these allegations do not cure the fundamental problem that the alleged statements attributed

26   to Chan do not at all speak on the subject of the rumors or OmniVision's alleged difficulties with *Apple*,

27

28

as opposed to other customers.[2]  Thus, even assuming Chan knew adverse information, and acted on it by selling his stock, the July 6, 2011 generic statements regarding the BSI-2 product, without reference to Apple, were not misleading such that they triggered a duty to disclose and therefore are not actionable.

Having reviewed the Complaint and considered the parties' arguments, the court finds only two statements that sufficiently cover the alleged omissions as to be potentially actionable:[3] (1) Chan's alleged statement on September 1, 2011, relayed through a JP Morgan analyst, that "he believes OVTI has only gone head-to head with Sony once (so far) and claims that OVTI won the resulting design opportunity for a 2012 product," Compl. ¶ 147, and (2) Chan's alleged statement on September 20, 2011, relayed through a Wedbush analyst, that "in terms of its market share, the company believes its OEM relationships remain unchanged," *id.* ¶ 149.  Although neither of these statements refer to Apple, they could nonetheless be false or misleading if Apple had in fact already selected Sony as the provider of image sensors for the iPhone 4S.  The first statement would be inaccurate because OmniVision would have actually gone head-to-head with Sony more than once, and OmniVision would have lost the design opportunity for the iPhone 4S, a 2011 product.  As to the second statement, Apple's decision to use Sony could be construed as a change in OmniVision's OEM relationships, and the statement can reasonably be interpreted as a statement that applies to *all* of OmniVision's OEM relationships, even if no customers are specifically named.  While the court can also imagine situations in which the second alleged statement was literally true, particularly in light of the accompanying statement that OmniVision "is not dependent upon one particular customer," the court concludes that the statement is sufficiently alleged to be misleading at this stage.  Because both of these alleged statements were relayed to the market through third parties, the court now turns to lead plaintiffs' conduit theory.

---

[2]  The court discusses these allegations, in the context of falsity and scienter more broadly, below.

[3]  To be clear, the parties did not particularly focus on these alleged statements in their briefing. Rather, the court has reviewed all of the alleged statements in the Complaint, bearing in mind the principles as discussed in this order that an alleged statement must be sufficiently attributed to a defendant, must contain sufficient factual content to be more than puffery, and must be false or misleading in light of the alleged truth about OmniVision's relationship with Apple with respect to the iPhone 4S given that the Complaint makes no allegations about OmniVision's other customers or business. Having conducted that review, the court found the other alleged statements deficient for one or more of the reasons explained herein.

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5.   Conduit Theory

A defendant may be held liable for "ma[king] false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market." *See Cooper v. Pickett*, 137 F.3d 616, 623-24 (9th Cir. 1997). "When statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held to be actionable even if they are not exact quotations." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004). Defendants contend that to show a statement "clearly originated" from them, the report must identify a specific individual defendant as making the allegedly false statement, while lead plaintiffs contend that, at the pleading stage, references to discussions with "management" are sufficient. The court need not resolve that issue to address the two statements identified above, however, because both sufficiently attribute the alleged statements specifically to Chan.

Defendants concede that the statement in paragraph 147 is attributed to a specific defendant. Dkt. No. 135 at 4:21-23. While the attribution is somewhat less direct in paragraph 149, the court finds it sufficient. Specifically, the report refers to a "Management Access Call (MAC)" with Chan the day before and titled the report "MAC Key TakeAways . . . ." Compl. ¶ 149. The portion excerpted in the Complaint then begins to speak in terms of "management" and later states:

> Management believes OEM relationships remain unchanged; not dependent upon one customer. OVTI noted that in terms of its market share, the company believes its OEM relationships remain unchanged. Management also highlighted that it is not dependent upon one particular customer and "when you see softness in multiple verticals, it can add up fast."

*Id.* While it is possible that the report had begun referring to a different conversation, with a different member of management, given the report's focus on the MAC it is certainly plausible that the statements originated from Chan.

The court agrees with defendants that sometimes even a statement in an analyst report that appears attributed to a defendant can in fact be largely analyst interpretation. For example, after the August 25, 2011 call, an analyst reported, "management insists that these technical issues have not caused OVTI to lose any additional share at Apple and that the relationship remains intact." Compl. ¶ 144. Yet the court could not find, and lead plaintiffs have not identified, any portion of the actual call

United States District Court
For the Northern District of California

transcript in which a defendant made any statement to that effect. *See* Dkt. No. 121, Exh. O.[4] However, absent a clear indication of misattribution or interpretation as in that example, the court finds it inappropriate on a motion to dismiss to question allegations of specific, factual statements that are unambiguously attributed by analysts to defendants.

In sum, while defendants' alleged statements for the most part have not been shown to be actionable, lead plaintiffs have identified two specific statements attributed to Chan that could be false or misleading:

1.   On September 1, 2011, Chan allegedly stated that OmniVision had only gone head-to-head with Sony once and that OmniVision had won the resulting design opportunity, which was for a 2012 product.  Compl. ¶ 147.

2.   On September 20, 2011, Chan allegedly stated that, in terms of market share, OmniVision's OEM relationships remained unchanged.  Compl. ¶ 149.

**B.      Falsity**

The truth or falsity of statements #1 and #2 above depends on the truth of the underlying information that was allegedly omitted: that Apple had decided to use Sony's image sensor over OmniVision's. The Complaint certainly alleges, and defendants do not appear to dispute, that Apple did in fact end up using Sony's image sensor in the iPhone 4S and to all appearances did not use OmniVision at all, even as a secondary supplier. *See* Compl. ¶¶ 157, 178. For determining whether the alleged statements were false or misleading when made, the critical issue is *when* Apple decided to use Sony components or, stated somewhat differently, when OmniVision lost all reasonable chance of having its image sensors included in the iPhone 4S.

**1.      Expert Allegations**

---

[4] On a motion to dismiss, the court may consider the contents of documents whose contents are alleged in the complaint and whose authenticity is not disputed, and may take judicial notice of matters of public record such as SEC filings. *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 953-54 (N.D. Cal. 2007).  Lead plaintiffs do not oppose the court's consideration Exhibits A-Q and S to defendants' request for judicial notice, which include OmniVision's SEC filings and conference call transcripts.  The court finds it unnecessary to its ruling to consider Exhibit R or the page from OmniVision's website; accordingly, the court does not rule on defendants' request for judicial notice nor lead plaintiffs' objections as to those two documents.

The defendants argue that the Complaint's allegations, relying mainly on Expert A, are insufficient to establish that the iPhone 4S had an extended product development cycle such that Apple would have decided by the start of the Class Period on August 27, 2010 to use Sony components. "There is authority for the proposition that a plaintiff in a securities fraud action controlled by the requirements of the PSLRA can support its allegations of falsity with facts provided by an expert." *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535 at *30 (N.D. Cal. 2007) (citing *Nursing Home*, 380 F.3d at 1233-34). However, "such factual allegations are subject to the same standard applied to evaluate facts alleged to have originated with any 'confidential informant' (or other witness)." *Id.* (noting that *Nursing Home* found the witnesses had been alleged "with sufficient particularity to establish that they were in a position to know Oracle's accounting practices").

In *In re Textainer Partnership Securities Litigation*, 2007 WL 108320 at *6 (N.D. Cal. 2007), the court found that the plaintiff had adequately alleged the factual basis for his contention of an increase in the price of new containers by alleging prices reported in industry literature, which the plaintiff's consultant had reviewed in concluding that prices increased. However, the court held that the plaintiffs had failed to allege that the prices for *used* containers had risen by a similar amount:

> Although plaintiff continues to allege that Manalytics' databases contain data on new and used container prices, plaintiff has not amended the complaint to allege a summary or estimate of used container prices during the relevant periods, or any calculations comparing used container prices to new container prices. Rather, plaintiff alleges the mere conclusion that "[b]ased on its industry expertise and knowledge of the market environment during [the relevant] time period, Manalytics indicated that the value of an active fleet would increase by a similar proportion to the newbuild prices due to increased lease rates and other demand factors such as high container utilization, reduced buying by shipping lines due to increasing prices, and increasing secondary market prices (influenced by new equipment prices with a 60-90 day lag time)." Such a conclusory allegation fails to comply with the Ninth Circuit's admonition that the PLSRA requires a plaintiff to "provide, in great detail, all the relevant facts forming the basis for [the] belief' that a statement is misleading, and to "provide a list of all relevant circumstances in great detail." Moreover, the issue in the instant action is not whether prices for new and used containers ordinarily "would" increase at the same rate, but whether they actually did so during the relevant time period.

*Id.* (citations omitted). A similar problem seems to affect the Complaint's expert allegations here: even assuming the allegations of Expert A's experience and qualifications are sufficient to support general assertions about product development cycles in the industry, lead plaintiffs have provided no factual basis supporting Expert A's ability to speak about Apple and the iPhone 4S, and that is the issue in the

**United States District Court**
For the Northern District of California

1   instant action. Expert A is not alleged to have ever worked with Apple, much less on the iPhone 4S.

2   Rather, Expert A's opinions are based in part on an unspecified "investigation related to the 2011 Apple

3   iPhone." Compl. ¶ 213. Like the expert in *Textainer*, Expert A's statements about Apple are phrased

4   in terms of what Apple "would have" done, i.e., expectations and predictions, not facts about what Apple

5   actually did.

6        Under the PSLRA, a complaint must specify why each statement is misleading "and, if an

7   allegation regarding the statement or omission is made on information and belief, the complaint shall

8   state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The

9   Complaint's reliance on Expert A's opinion is essentially an allegation made on information and belief

10  without disclosing the factual basis for Expert A's, and therefore lead plaintiffs', belief. *See In re*

11  *Textainer P'ship Sec. Litig.*, 2006 WL 1328851 at *5 (N.D. Cal. 2006). In contrast, the plaintiffs in

12  *Nursing Home* had alleged in great detail the bases for the expert's analysis, including the contents of

13  internal documents he had reviewed and what he had learned from conversations with the defendant's

14  employees. 380 F.3d at 1233. Thus, it is insufficient for lead plaintiffs to simply assert that "Expert A

15  conducted an investigation . . . and expressly states design cycle dates that are the product, *inter alia*,

16  of such investigation." Dkt. No. 128 at 28:16-17. It is also irrelevant that the Complaint sets forth

17  Expert A's *conclusions* in great detail. Rather, lead plaintiffs must allege with particularity what Expert

18  A's investigation reviewed or revealed, specifically as to Apple and the iPhone 4S, that forms the factual

19  *basis* for the opinions. Based on the current Complaint, the allegations about Expert A cannot support

20  an inference of falsity.

### 2.   Other Allegations

22       While the Complaint relies in large part on Expert A to support the contention that defendants'

23  alleged statements were false as early as August 2010, there are some other allegations that shed some

24  light on the relationship between OmniVision and Apple. Particularly because Chan's alleged

25  statements were so late in the class period, and came less than two months before the iPhone 4S launch,

26  lead plaintiffs' case on those two statements does not necessarily fail simply because they cannot rely

27  on Expert A's allegations.

28

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW
LJP/ALG

First, as noted above, the Complaint alleges, based on information from a confidential witness, CW 2, that in June 2011 Apple returned via rush delivery a prototype image sensor that OmniVision had offered for inclusion in the iPhone 4S.  Compl. ¶ 125.  CW 2 allegedly "learned that the reason Apple returned the 8 MPx OVTI prototype is because it had 'malfunctions' — the image sensor was not compatible and thus, would not work with the new iPhone."  *Id.*  Defendants argue that this shows OmniVision was still working with Apple to fix problems in time to secure the inclusion of its sensor in the iPhone 4S, contradicting the notion that OmniVision was out of the running by the end of 2010. While the allegations are susceptible to that interpretation, they are also consistent with lead plaintiffs' theory that OmniVision was desperately trying to win back the slot it had lost to Sony.  Under the standards for a motion to dismiss, the court finds that the allegations at least support an inference that, as of June 2011, OmniVision was having difficulty securing the inclusion of its sensor in the iPhone 4S.

Defendants also argue that the Complaint does not sufficiently allege how CW 2 learned about why Apple returned the prototype.  The Complaint alleges that CW 2 was a Senior Systems Engineer employed at OmniVision from April 2011 to July 2011 and that the prototype was brought to CW 2's cubicle by an OmniVision IT specialist, *id.* ¶ 125, though the Complaint does not describe CW 2's job responsibilities or how he was involved with the prototype.  *Cf. In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (noting plaintiffs had alleged confidential witnesses' job description and responsibilities). In general, confidential sources must be "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint [must] contain[] adequate corroborating details."  *Id.* at 1015 (internal quotations omitted).  Here, while marginal, the court finds the allegations sufficient to suggest CW 2 would know the information alleged.

Second, the Complaint also alleges details about Sony that could suggest that OmniVision was losing or had lost substantial ground to Sony during the Class Period: by early 2010 Sony allegedly made a focused effort to win Apple's business and supply image sensors for the new iPhone, *id.* ¶ 57; an analyst reported in April 2010 that OmniVision had lost the 8 MP camera design at Apple to Sony, *id.* ¶ 59; Sony purchased a manufacturing facility in December 2010 that expanded its capacity for manufacturing CMOS sensors, *id.* ¶ 90; and in April 2011 Sony's CEO made cryptic comments possibly

1    suggesting that Sony was supplying camera components to Apple, *id.* ¶ 106.  Viewed in a light most

2    favorable to Lead Plaintiffs, these allegations at least establish an inference that, at some point during

3    the Class Period, Apple was seriously considering purchasing some or all of the camera components at

4    issue from Sony instead of OmniVision.

5         Finally, the Complaint sets forth insider trading allegations.  While insider trading is more

6    directly probative of scienter, it can also support an inference of falsity:

> Insider trading goes more directly toward proving that the defendants knew the
> statement was false than proving that the statement itself was false. But proof of
> knowledge of falsity and falsity may overlap. For example, suppose that a police
> officer approaches a crowd to see what is going on, and a man walks out of the
> crowd, sees the police officer, and puts his hands together to be handcuffed. The
> man's actions suggest both that he knows he is guilty of some crime and also that
> some crime has been committed. Insider trading can work in the same way. If insiders
> owning much of a company's stock make rosy characterizations of company
> performance to the market while simultaneously selling off all their stock for no
> apparent reason, their sales may support inferences both that their rosy
> characterizations are false and that they knew it. We have considered insider trading
> as circumstantial evidence that a statement was false when made.

*Ronconi v. Larkin*, 253 F.3d 423, 434-35 (9th Cir. 2001).[5]  Insider trading requires "unusual" or

"suspicious" stock sales, i.e., trading that "is dramatically out of line with prior trading practices at times

calculated to maximize the personal benefit from undisclosed inside information." *Id.* (citation omitted).

The relevant factors include (1) the amount and percentage of shares sold by insiders; (2) the timing of

the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.* (citation

omitted).

    Here, lead plaintiffs allege that defendants' Class Period sales were concentrated in five trading

days: June 15, 2011, and the four trading days between June 29, 2011 and July 5, 2011.  Compl. ¶ 186.

Specifically, on those days Hong sold a total of 54,195 shares, Chan sold 100,000 shares, and Cisneros

sold 49,268 shares.  *Id.* ¶¶ 182, 184, 185.  However, Chan's sales were made pursuant to a 10b-5 trading

plan adopted in March 16, 2011, *id.* ¶ 184, and the present allegations are insufficient to suggest that

Chan knew any adverse information, or that there was any adverse information to know, at the time the

---

[5]  Although *Ronconi* refers to falsity of "rosy characterizations," the court believes the insider
trading allegations here, without more, cannot support actionable falsity in defendants' generic
alleged statements (i.e., the vague or forward looking statements not referencing Apple or
OmniVision competitors) that are analyzed in Parts II.A.1-3, *supra*.  Notably, the *Ronconi* court still
required allegations of specific misstatements of historical fact and rejected the plaintiffs' reliance on
forward-looking optimism.  *See* 253 F.3d at 430-31.

United States District Court
For the Northern District of California

plan was adopted. Thus, the court cannot consider Chan's sales suspicious. As to Hong, his sales were less than 10% of his holdings and are dwarfed by the number of shares he sold pursuant to his 10b-5 trading plan both before and during the Class Period. *See id.* ¶¶ 182, 187. Cisneros' sales were larger, 60% of his pre-Class Period holdings or, using defendants' calculations, 35% of his shares and options available to sell during the Class Period. *See id.* ¶ 187; Dkt. No. 121 at 24 & n.59. Moreover, Cisneros had not sold any shares during the 452 day period before the Class Period. Compl. ¶ 185. Thus, Cisneros' sales were at least somewhat notable in that he rarely sold any stock and because 35% is a considerable amount. More importantly, the timing can be considered suspicious in that the sales occurred near Class Period highs, shortly after Apple allegedly reported problems with OmniVision's product, and just before rumors led to a steep drop in stock price. *See* Compl. ¶¶ 125, 127, 132, 185-186. While Hong's out-of-plan sales do not seem particularly large or different from his past practice, that he began selling shares on June 29, 2011, the same day Cisneros made his sales, is somewhat corroborative. *Cf. Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) ("We typically require larger sales amounts [than 37%]—and corroborative sales by other defendants—to allow insider trading to support scienter."). Thus, the insider trading allegations support an inference that OmniVision was experiencing problems in June 2011.

Given the indications that something was wrong in June 2011, and that in the end Apple did not select OmniVision's image sensor, the court finds that there are sufficient factual allegations to make it plausible that Chan's statements in September 2011 were false when made. The court now turns to the related but separate question of whether Chan's statements were made with scienter.

**C.    Scienter**

Lead plaintiffs primarily rely on three sets of allegations to support an inference of scienter: (1) the alleged importance of OmniVision's Apple iPhone business; (2) the extended design-to-launch cycle for the iPhone 4S, which included important periodic milestones; and (3) insider trading. The court addresses each in turn.

**1.    Core Operations Allegations**

In determining whether a plaintiff has sufficiently alleged scienter, core operations allegations are considered as part of a holistic review of all of the allegations in the complaint. *South Ferry LP, No.*

1   *2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  However, core operations allegations, standing alone,

2   are generally insufficient:

> Where a complaint relies on allegations that management had an important role in the
> company but does not contain additional detailed allegations about the defendants'
> actual exposure to information, it will usually fall short of the PSLRA standard.

5   *Id.*; *accord Metzler*, 534 F.3d at 1086 ("[C]orporate management's general awareness of the day-to-day

6   workings of the company's business does not establish scienter—at least absent some additional

7   allegation of specific information conveyed to management and related to the fraud.").

8       Here, the Complaint's core operations allegations may be summarized as follows: OmniVision's

9   mobile phone segment accounted for approximately 65% of its revenue in 2009, 2010, and 2011, a large

10  part of which came from smartphone component sales, and the smartphone market was, in Hong's

11  words, OmniVision's "number one priority."  Compl. ¶¶ 190, 196.  Hong had what several confidential

12  witnesses described as a hands-on management style in which he sought to know and control myriad

13  aspects of OmniVision's operations.  *Id.* ¶¶ 191-195, 197.  OmniVision held weekly management

14  meetings attended by Hong, Chan, and Cisneros and, according to one confidential witness, Hong

15  included Chan, and to a lesser extent Cisneros, in his trusted inner circle.  *Id.* ¶ 194.  In addition, Hong

16  stated publicly that OmniVision worked closely with customers during all stages of the product cycle.

17  *Id.* ¶ 196.  Cisneros also stated that OmniVision worked "very closely with our customers" and that he

18  worked with OmniVision's engineering, product development, and production teams on a daily basis.

19  *Id.*  Regarding Apple specifically, OmniVision held weekly meetings to review the status of its business

20  relationship with Apple, as well as weekly meetings between OmniVision sales personnel and Apple

21  representatives, at least one of which Hong participated in.  *Id.* ¶¶ 199-200.  There was also close

22  communication among Apple's procurement group and OmniVision lead engineers, and OmniVision's

23  sales force and Hong were in regular conversation with Apple.  *Id.* ¶ 203.  Apple had also worked

24  closely with OmniVision historically: according to two confidential witnesses who had been involved

25  with the Camera Cube project for the iPod Touch in 2009, Apple supplied its own engineers to monitor

26  the progress and production of OmniVision's image sensors and independently verify performance;

27  problems would be relayed to Apple executives and in turn to OmniVision executives; and, when

28  problems arose, Hong visited Apple's premises and Apple personnel visited OmniVision.  *Id.* ¶¶ 197-

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW
LJP/ALG
25

United States District Court
For the Northern District of California

198, 205-207.  Apple's iPhone represented a significant business opportunity for OmniVision, given the success of the iPhone 4 and the anticipation around and predicted success of the iPhone 4S.  *Id.* ¶¶ 201-202.  Externally, the market was intensely focused on OmniVision's supply position with Apple and stock price moved based on information the market received in that regard.  *Id.* ¶¶ 206-207.  According to OmniVision's Director of Investor Relations from December 2008 through October 2009, all information being disseminated to the investing public needed Hong's direct approval; a former human resources manager also stated that Hong controlled how and what OmniVision communicated to investment analysts and/or the media.  *Id.* ¶¶ 208.

While these allegations strongly support that Chan was heavily involved in OmniVision's core operations, the court notes that these core operations allegations do suffer from some shortcomings.  First, there are no allegations of *specific* information about the iPhone 4S that was communicated to any individual defendant.  Instead, there are allegations such as CW 3's belief that Hong, Chan, and Cisneros all "would have known" of image sensor production problems.  *Id.* ¶ 193.  CW 3 was allegedly a Senior Technical Recruiter responsible for assembling the CMOS sensor engineering team, who knew Hong "'very well' on a business level" and had "a working relationship" with Chan and Cisneros.  *Id.* ¶ 192.  However, it is difficult for the court to infer from these allegations that CW 3 would possess information about defendants' knowledge of production problems, specifically.  *See Daou*, 411 F.3d at 1015.  Similarly, CW 5 believes defendants "would have been alerted" to problems under the procedures in place when he left in January 2009, *id.* ¶¶ 197-198, which requires considerable speculation to apply to late 2010 and 2011.

Second, the allegations focus heavily on Hong and say very little about Chan's and Cisneros' roles.  Other than the "would have known" allegations discussed above, the allegations reflect that Chan and Cisneros attended weekly management meetings, and that Chan was included in Hong's "trusted inner circle."  *Id.* ¶ 194.  Lead Plaintiffs also allege that "[s]ometimes, CEO Hong's 'direct reports' such as CFO Chan would update CEO Hong regarding discussions with Apple given the importance of that customer to OVTI."  *Id.*  ¶ 203.  This allegation suggests that Chan had direct discussions with Apple, or received information about such discussions.  Although the Complaint lacks details as to the kinds of information Chan discussed or what Chan's specific responsibilities were concerning the business

United States District Court
For the Northern District of California

1  relationship with Apple, the court can at least infer from this allegation that Chan had a personal

2  relationship with Apple.

3        Third, the allegations concerning Hong's control over communications with investors come from

4  confidential witnesses who may not be the most reliable sources.  CW 7, who was Director of Investor

5  Relations, can only speak on Hong's practices through October 2009, while CW 8, who was at

6  OmniVision through September 2010, was employed in human resources and so would seemingly have

7  less reason to know about Hong's practices in communicating with analysts and the media.

8                    **2.        Apple's Alleged Design-To-Launch Cycle**

9        As discussed above, the Complaint does not contain sufficient allegations about Expert A's

10 investigation that forms the basis of his opinions about Apple's design-to-launch cycle.  Without more

11 detail, the court cannot accept the allegations about specific timing or milestones that "would have"

12 occurred during the Class Period.  In turn, without the surrounding context of Apple's alleged timeline,

13 Apple's alleged return of a prototype image sensor in June 2011 is subject to differing interpretations,

14 though as discussed above it does at least suggest that OmniVision was experiencing problems in getting

15 its image sensor included in the iPhone 4S.  It is also difficult to evaluate the allegations that

16 OmniVision personnel, including Hong, were in frequent contact with Apple, as the allegations do not

17 otherwise strongly suggest when a final decision would have been made by Apple about suppliers for

18 the iPhone 4S.

19                    **3.        Insider Trading Allegations**

20       As discussed above, Hong's and Cisneros' sales in late June and early July 2011 support an

21 inference that there were problems at OmniVision, but the Complaint does not suggest that Chan's sales

22 were anything but innocent.  It is difficult for the court to evaluate the other insider trading allegations

23 because, as discussed above, the Complaint does not contain sufficient allegations to suggest that

24 material adverse information was being concealed throughout the Class Period.  Thus, although Cisneros

25 sold shares on January 5, 2011, *id.* ¶ 185, the court has no context from which to find that suspicious

26 other than the mere fact that Cisneros had not sold any shares for more than a year before that.  The

27 remaining insider trading allegations simply state the total number of shares sold during the Class Period

28 compared to the time preceding the Class Period.  *See id.* ¶¶ 181, 187-188.  If these sales occurred

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW
LJP/ALG                                        27

before any of the sufficiently-alleged adverse events, then there would be little basis for the court to find

them suspicious. *See Metzler*, 534 F.3d at 1086 (finding "nothing particularly suspicious" about the

timing of sales that occurred before the government began its investigation at the defendant's campus).

Despite the shortcomings discussed above in the core operations allegations other allegations

*when viewed in isolation*, the court must engage in a "holistic review of all of the allegations in the

complaint." *South Ferry*, 542 F.3d at 784.  Viewing the Complaint as a whole, the court can infer that

Chan had sufficient core operations knowledge as part of Hong's "trusted inner circle" and as a

participant in weekly management meetings–combined with (1) Chan's alleged direct contact with Apple

and (2) the returned OmniVision image sensor in June 2011–such that he knew, as did Hong and

Cisneros, of core production problems prior to September 2011, when he made the allegedly false and

misleading statements.  The allegations show that Hong tightly controlled information reaching the

public, at least up through 2009, and the court can reasonably infer that Hong's practice remained

unchanged in 2011.  From this, the court can also reasonably infer that Hong would not keep Chan out

of the loop on key issues affecting OmniVision's business relationships, especially where Chan was in

a position to, and did, convey information to the public through analysts.  Thus, because the Complaint

sufficiently alleges two actionable misstatements that were false when made and made with scienter,

the court cannot dismiss the Section 10(b) claim or Section 20 claim.[6]

### III.  ORDER

For the foregoing reasons, the court denies defendants' motion to dismiss based on Chan's

September 1, 2011 and September 20, 2011 statements.

DATED:     March 29, 2013

*Ronald M. Whyte*

RONALD M. WHYTE
United States District Judge

---

[6]  If a Section 10(b) claim is adequately pled, defendants do not dispute that a Section 20 claim is
also adequately pled.

ORDER DENYING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT—No. C-11-5235 RMW
LJP/ALG                                                              28

United States District Court
For the Northern District of California